**Roger L. LYLE, Petitioner-Appellant,**

v.

**Theodore KOEHLER and Frank J. Kelley, Respondents-Appellees.**

**No. 82–1447.**

United States Court of Appeals, Sixth Circuit.

Argued March 31, 1983.

Decided Oct. 21, 1983.

Rehearing and Rehearing En Banc Denied Dec. 22, 1983.

Richard H. Drucker argued, Cleveland, Ohio (court-appointed), for petitioner-appellant.

Frank J. Kelley, Atty. Gen., of Michigan, Lansing, Mich., for respondents-appellees.

Before MERRITT and MARTIN, Circuit Judges and PORTER, Senior District Judge.*

MERRITT, Circuit Judge.

After a jury trial in the Circuit Court for the County of Saginaw, Michigan, petitioner Roger L. Lyle was convicted of two counts of first degree felony murder and one count of assault with intent to murder, and was sentenced to three concurrent life terms. Having exhausted his state remedies, Lyle filed a *pro se* petition for a writ of habeas corpus in the United States District Court for the Eastern District of Michigan. He now appeals that court's decision to dismiss the petition.

This case arose out of shootings that occurred shortly after midnight on April 14, 1976, in the home of Feadow and Deborah Jones, both of whom died from the gunshot wounds they received. Alzenia Price—a third victim—survived the attack, although she had been shot twice in the head, and

ultimately testified at appellant's trial. Price testified that four men forced their way into the Jones' house and took various pieces of jewelry before shooting the victims. One of the Jones' neighbors saw a large brown car with a beige top park in front of the Jones residence and, after hearing shots, observed the same car drive away quickly.

Shortly after the shootings, the Saginaw Police Department issued a radio report tying one Howard "Pussycat" Johnson to the incident. In response to this report, two police officers proceeded to Johnson's neighborhood and arrested appellant and Nathaniel Kemp, both of whom the police observed leaving a house and entering a car that resembled the description of the assailants' getaway car. The police moved in to make the arrest when they recognized Johnson and another unidentified individual approaching the car in which Lyle and Kemp sat. The officers were unable to apprehend Johnson and his companion, both of whom fled on foot, but succeeded in taking Lyle and Kemp into custody. At a subsequent lineup, Price identified Lyle as one of her attackers but did not recognize Kemp. The police did, however, find a fingerprint left by Kemp at the Jones' home. Lyle and Kemp were both convicted following their joint trial.

Lyle challenges his conviction on several grounds, each of which we shall consider in turn. Because we find that he did not receive sufficient opportunity to confront the witnesses against him, we are compelled to reverse the judgment of the District Court denying his petition.

## INEFFECTIVE ASSISTANCE OF COUNSEL

In his closing argument to the jury, Lyle's trial counsel contended vigorously that the government had failed to prove Lyle's involvement in the shootings and that, as the District Court observed, "petitioner was being prosecuted ... [only] be-

---

* The Honorable David S. Porter, Senior Judge, United States District Court for the Southern District of Ohio, sitting by designation.

cause of his supposed association with Howard 'Pussycat' Johnson." *Lyle v. Koehler,* Civ. No. 80–74578, at 5 (E.D.Mich.1982). Trial counsel also contested the government's theory that the homicides occurred in conjunction with a robbery, maintaining instead that they were drug related:

You don't commit an armed robbery by saying, "where's the stuff? where's the stuff?"

You don't plan on committing an armed robbery and using other people's guns, either. You don't make people take their clothes off and make them go downstairs and tell them you are going to shoot them. This was an execution. This was an execution.

And it was for a reason. And it wasn't because of money or because of a watch or a couple of rings. Don't you believe it was, because it wasn't.

(Tr. 966.)

■ Appellant insists that this argument amounted to an admission of guilt by his trial counsel, and thus constitutes ineffective assistance of counsel. According to appellant, this argument effectively denied him of the right to a jury trial on the crimes charged. In *Wiley v. Sowders,* 647 F.2d 642, 649 (6th Cir.1981), this Court held that although "[c]ounsel may believe it tactically wise to stipulate to a particular element of a charge or to issues of proof . . . an attorney may not stipulate to facts which amount to the 'functional equivalent' of a guilty plea." Because trial counsel in *Wiley* explicitly admitted his client's guilt, we reversed the lower court's denial of the writ of habeas corpus. The instant case, however, involves no such explicit admissions of guilt by trial counsel. On the contrary, as the District Court noted, counsel's argument simply commented on the government's theory of the case and never conceded that Lyle was involved in any of the events that transpired at the Jones' residence. Although unsuccessful, the argument certainly met the standard set by this Court to govern effectiveness of counsel cases. *See Beasley v. United States,* 491 F.2d 687, 696 (6th Cir.1974) ("assistance of counsel required by the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance"). We, therefore, agree with the District Court that counsel's summation did not generate any violation of appellant's constitutional rights.

■ Lyle's second ineffectiveness of counsel claim involves trial counsel's failure to object to the court's instruction that the jury might consider the number of witnesses presented by each side in the case.[1] In the District Court, appellant framed this issue as a direct challenge to the constitutionality of the jury instruction, making no ineffectiveness of counsel allegation. Noting that the Michigan Court of Appeals had invoked the state's contemporaneous objection rule to dismiss this claim, the District Court held that it was barred under *Hockenbury v. Sowders,* 620 F.2d 111 (6th Cir. 1980), *reh'g denied,* 633 F.2d 443 (1980), from considering the claim anew absent a showing of cause and prejudice as required by *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).[2] We refuse to permit appellant to escape the consequences of *Sykes* doctrine simply by recasting the issue as an ineffectiveness of counsel claim.[3] Such a result would violate the fundamental principle that an appellate

---

1. Whereas the government presented many witnesses, neither Lyle nor his co-defendant called anyone to testify in his behalf.

2. Similarly, as the District Court held, Lyle's failure to show cause and prejudice under *Sykes* precludes our review of two of his other claims: (1) that the prosecutor impermissibly shifted the burden of proof to the defense in his closing argument; and (2) that the trial court erred in not requiring the jury to find malice as an element of the crime of felony murder.

3. Not only did the District Court never consider this particular ineffectiveness of counsel claim, the state court also did not receive any opportunity to address the argument. Were we to review the claim, we would thus violate the Supreme Court's rule against federal court review of habeas corpus petitions containing exhausted and unexhausted claims. *See Rose v. Lundy,* 450 U.S. 910, 101 S.Ct. 1346, 67 L.Ed.2d 333 (1982).

court may not consider claims not raised in the court below. *See Bannert v. American Can Co.,* 525 F.2d 104 (6th Cir.1975).

The same rationale governs our disposition of Lyle's third and final ineffectiveness of counsel claim, which cites his trial counsel's failure to object to the judge's jury instruction regarding felony murder.[4] Having failed to present this theory in his petition to the District Court, appellant cannot now obtain review of the claim from this Court.

## THE GOVERNMENT'S IMPEACHMENT OF ITS OWN WITNESSES

■ At trial, the government called Kenneth Newton—a friend of both defendants—as a witness and proceeded to impeach his testimony regarding the defendants' supposed alibi. Lyle claims that the government's impeachment of its own witness and its injection of the issue of alibi into the case deprived him of a fair trial. We disagree. Finding that Newton's alibi testimony was a surprise, the Michigan Court of Appeals held that the government was entitled to show why it had called Newton as a witness under *People v. White,* 401 Mich. 482, 508–10, 257 N.W.2d 912, 924–25 (1977). Moreover, as the District Court pointed out, the government would also have been permitted to impeach Newton under Fed.R.Evid. 607, which, while not controlling in a state trial, "certainly provides persuasive evidence that allowing the prosecutor to impeach his own witnesses does not rise to a constitutional violation meriting habeas corpus relief." *Lyle v. Koehler,* Civ. No. 80–74578, at 9–13 (E.D. Mich.1982).

## CONFRONTATION CLAUSE VIOLATION[5]

Lyle and co-defendant Kemp were arrested together on the night of the shootings shortly after they left a house on the same street as the house of Kenneth Newton. Lyle argues that the admission at trial of several extra-judicial statements by Nathaniel Kemp about a person named "Rock" incriminated Lyle because the jury would naturally have concluded that "Rock" and Lyle are the same person. He argues that admission of this evidence thus deprived him of his sixth amendment right to confront adverse witnesses, inasmuch as Kemp did not testify at their joint trial. The state court and the District Court found that the Kemp statements do not incriminate Lyle and, therefore, do not violate the confrontation clause. We cannot sustain this holding.

While in jail awaiting trial, Kemp instructed his sister, Vyethel, to deliver two letters he had written to Kenneth Newton and Nelson Calhoun. The letters attempt to establish an alibi. At trial, the prosecutor had Vyethel Kemp identify the letters. At the end of the government's case, the following edited versions of the letters were admitted into evidence and read to the jury without limiting instructions. First, the letter to Mr. Newton:

What it is Squeeze....

Like dig, I guess you are already informed that these honkies are trying to frame me over some bullshit, so I need you to testify in my behalf. I know that I can count on you to take care of business.

This is what I want you to run: Rock came by your house at 10:30 p.m. Tuesday. You'all just kicked it around for a while. Rock was there about 20–25 minutes before I came by at about 5 or 10 minutes to 11:00 p.m., with my chess board and we played chess and just kicked it around for about 1½ hours. Then I asked you what time it was and you looked at your clock and said that it was 12:20 a.m. So, I said that "I am getting ready to leave so that I can take

4. Appellant also raises this issue substantively in his allegation of constitutional error by the trial court, an argument that we likewise reject. *See supra,* note 2.

5. In a related argument, Lyle claims that the trial court erred in refusing to grant his motion to sever his trial from Kemp's. Our disposition of the confrontation issue makes consideration of the severance argument unnecessary.

my sister's car back to her." Rock asked if I would give him a ride home and I said, "Yea, come on, let's go." So Rock and I left. You walked us to the door but didn't come outside, so you didn't see where I was parked.

Tell them that after you got back upstairs to your room, you heard tires screeching so you looked out your window and saw my car parked in a driveway on Carroll between 4th and 5th, and police cars had it surrounded and they had rifles and pistols out. Rock and I were standing in the back of my car with our hands stretched out on the trunk of it. Then they handcuffed us behind our backs and put us in a police car, for about 15 minutes the car just sat there, then the car they put us in left. The rest of the cars stayed there for about 10–15 minutes longer.

You didn't come down because you didn't know what was jumping off and you didn't want to get involved.

After all the cars had left, you walked to a pay phone and called my people to let them know that I was in some kind of trouble. You called Vy at about 1:00 a.m. and told her what had happen.

Dig, I was going to have Howard Nettles say that he was there but my lawyer told me not to change my story, since I had told the detectives there wasn't anybody else there at your house besides you, me and Rock. So run it on him when you see him.

That's all you have to run, and please don't change it. No matter what anybody say, because your alibi will be very fundamental for me.

In case they ask:

1. You have never seen or heard me or Rock with Pussycat or mention his name in any conversation.

3. No, this wasn't the first time Rock and I had been over to your house at the same time. It really was a common thing for us to drop by since we were all cool.

4. That it's not unusual for somebody to park down the street from your house, because there are a lot of roomers that stay in the same building as you and the house next to yours always have a lot of people running in and out at all times of the day and night, so cars are generally parked in front of your house, so people park where they can.

5. You have never had a felony conviction.

So, that's it, my man, it's all about you when the time comes. When you fully understand this letter, Destroy it because I don't want it to get into the wrong hands.

Don't write me any letters, Vy comes up to see me often if it's important enough maybe she'll deliver the message.

My preliminary is Monday, May 10th at 9:30 a.m. I hope to beat this shit then.

Later, Bro. Nate.

Tr. at 908–11.

And the letter to Mr. Calhoun:

What it is Grizz.

I guess you know that these honkies are trying to frame me on that Feido thing. They got me charged with two counts of first Degree murder, and one count of assault with intent to commit murder. I need you to testify for me.

All you have to say is that I came by your house at about 10:30 Tuesday night, over on Warren. I came by to ask you if you wanted to go over to Kenney Newtons house with me to play some chess, but you said no because you were waiting for somebody to come by. So, I stayed about 5 minutes and then left.

That's all you have to run, nothing else. Can I count on you?

Now in case they ask:

1. I was in my sisters car and I was by myself.

3. That I have never to your knowledge been over to Feido's house.

4. You have never seen me or Rock in the presence of Pussycat, nor have you ever heard us mention his name.

5. You saw a chess board lying on the front seat of my car, when I left you walked down to my car with me.

6. I had my burgundy leather coat on and my Corduroy pants (which were blue) and a light blue shirt.

7. You will have to tell them that you're out on an appeal bond because they will ask you just to see if you are going to lie. They know all about anybody that is to testify.

So, that's the story my man. It's all about you now.

I don't know exactly when I'll be going to court but I go to my preliminary Monday May 10th at 9:30 a.m. I hope to beat this shit then!

When you have understood this letter destroy it because I don't want it to get into the wrong hands.

If you have any messages to send me, don't write to me because they will be tapping my mail, there are no ways of letting me know what you want. Dig it!

Be Smooth My Man,

Nate.

Tr. at 911–13.

Lyle contends that the proof left no doubt that "Rock" and Lyle are one and the same person and that the introduction of these letters violated the confrontation clause of the sixth amendment.[6] According to that provision, "[i]n all prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. CONST. amend. VI. In *Pointer v. Texas,* 380 U.S. 400, 403–04, 85 S.Ct. 1065, 1067–68, 13 L.Ed.2d 923 (1965), the Supreme Court held that "the Sixth Amendment's right of an accused to confront the witnesses against him is ... a fundamental right and is made obligatory on the States by the Fourteenth Amendment," and that the right of cross-examination is included in that right. Then, in *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20

L.Ed.2d 476 (1968), the Court overturned the conviction of a petitioner because the confession of his non-testifying codefendant, which incriminated the petitioner as well, had been admitted at their joint trial. Although the trial court had explicitly instructed the jury that the confession was inadmissible hearsay against Bruton, the Supreme Court found that any limiting instruction was inadequate to preserve Bruton's confrontation right, citing "the practical and human limitations of the jury system." *Id.* at 135, 88 S.Ct. at 1627. The Court further noted that such confessions are "devastating to the defendant," that "their credibility is inevitably suspect" given the speaker's clear "motivation to shift blame onto others," and that this unreliability "is intolerably compounded" by the defendant's inability to test the confessions through cross-examination. *Id.* at 136, 88 S.Ct. at 1628.

The *Bruton* Court closely identified the confrontation clause with the principles embodied in the hearsay rule. 391 U.S. at 136 n. 12, 88 S.Ct. at 1628 n. 12. Similarly, in his exploration of the theory behind the hearsay rule, Wigmore states:

The main and essential purpose of confrontation is *to secure for the opponent the opportunity of cross-examination.* The opponent demands confrontation, not for the idle purpose of gazing upon the witness, or of being gazed upon by him, but for the purpose of cross-examination, which cannot be had except by the direct and personal putting of questions and obtaining immediate answers.

5 J. WIGMORE, EVIDENCE § 1395, at 150 (Chadbourn rev. 1974) (emphasis in original). The close relationship between these provisions of constitutional and evidentiary law suggest that the instant case should be analyzed as a hearsay question.[7]

---

**6.** Petitioner advances the same argument with regard to exculpatory oral statements made by Kemp to a detective after the arrest. Unlike the letters, however, these statements make no reference to any individual other than the witness and thus do not incriminate Lyle even indirectly. *See United States v. Dady,* 536 F.2d 675 (6th Cir.1976) (no *Bruton* violation where

testimony in question did not mention presence of any other individual).

**7.** Despite the Supreme Court's recognition of the common principles underlying the confrontation clause and the hearsay rule, Justice Stewart later denied that the Court had ever "equated" the two provisions. *Dutton v. Ev-*

Although none of the lower courts involved in this case has ever classified the letters as non-hearsay, and although the government has never challenged appellant's *Bruton* argument on that ground,[8] conventional hearsay analysis prompts us to consider whether Kemp's letters fall within the definition of hearsay at all, that is, whether they were "offered in evidence to prove the truth of the matter asserted." Mich.Ct.R.Evid. 801(c); Fed.R.Evid. 801(c). Believing the alibi to be false, the prosecution obviously did not seek to introduce the letters in order to demonstrate the truth of the particular statements they contained. Rather, the government intended to have the jury infer from the statements that Kemp was attempting to obtain fabricated alibi testimony, an act that revealed a "guilty mind" on his part regarding the shootings.[9] This guilty mind inference in turn invited the jury to infer Kemp's substantive guilt. *See United States v. Hackett*, 638 F.2d 1179, 1186 (9th Cir.), *cert. denied*, 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1980) (exculpatory statements used to prove declarant's guilty mind); *United States v. Holbert*, 578 F.2d 128, 130 (5th Cir.1978) (jury may decide whether defendant's false exculpatory statement implies guilty mind). Thus, in determining whether the letters constitute hearsay, we must decide whether the inferences that the government sought to elicit by introducing

them should be included within the set of "assertions" that the letters make.

This question highlights one of the few areas of disagreement between the two preeminent authorities on the law of evidence—Wigmore and Morgan. They differ on the question of when to cut off the chain of inferences to be made from an extra-judicial declaration in determining whether the statement is being offered for the truth of the matter asserted. Although neither scholar appears to have studied the precise situation presented here, it appears that Wigmore would have classified the letters as non-hearsay under his narrow interpretation of the hearsay definition. In a similar context, Wigmore cites the example of the statement "I am the Emperor of Africa." Because the statement is not offered for its truth, but rather as circumstantial evidence of mental aberration, Wigmore classifies it as non-hearsay. 6 J. WIGMORE, *supra*, § 1766, at 250 (Chadbourn rev. 1974). Morgan, however, criticizes Wigmore's unwillingness to include the inferences implicit in such a statement as part of the statement for hearsay purposes and notes that Wigmore's approach necessarily assumes the speaker's sincerity. Morgan, *Hearsay Dangers and the Application of the Hearsay Concept*, 62 HARV.L.REV. 177, 202–03 (1948). Morgan would not arbitrarily cut the chain of inferences before the necessary conclusion is reached if the purpose of introducing a declaration is to have the jury infer from

ans, 400 U.S. 74, 86, 91 S.Ct. 210, 218, 27 L.Ed.2d 213 (1970) (plurality opinion).

**8.** Apparently assuming that the letters are hearsay with regard to Lyle, the lower courts have upheld admissibility on the ground that the letters were not inculpatory. *See* discussion *infra*. The government has adhered to that analysis throughout the case.

**9.** In his summation to the jury, the prosecutor argued as follows:

Why does Nate Kemp have to tell Kenny Newton to get ahold of Howard Nettles and tell him that they can't use Howard Nettles as a witness in this case because he discussed it with his attorney and now it is Mr. Kemp's idea and impression that it would be better just to stick with the original witnesses that he mentioned to Detective Reeder when he was interviewed in the jail complex.

What inference do you draw from that? Why does he have to tell Grizz and Squeeze to not mention to anybody that Rock or I have ever been seen in the presence of Pussycat, nor have you ever heard us mention his name.

Why would you have to tell somebody that if they have never been seen in the presence of Pussycat and have never mentioned Pussycat's names? Wouldn't that be the normal answer you would get if you asked Mr. Newton: "Have you ever seen Mr. Pussycat in the presence of Nathaniel Kemp?"

"Well, no. I don't know."

Why did Mr. Kemp have to tell Kenny Newton: "In case they ask, Squeeze, it is not unusual for somebody to park down the street from your house because there are a lot of roomers that stay in the same building."

(Tr. at 943–44.)

it the assertion of a final proposition of fact (e.g., (1) "we need a false alibi," because (2) "we have no explanation of our conduct consistent with innocence" because (3) "we are guilty"). Under Morgan's view, the inference of Kemp's guilty mind, as reflected in the letters, is not severable from Kemp's raw statements; the letters accordingly present a hearsay problem.[10]

■ Although we consider the question of the proper classification of the letters exceedingly close, we find that the inferences they necessarily invite form an integral part of the letters. They were introduced because by inference they assert the proposition of fact that Kemp and Lyle committed the robbery and hence need an alibi. Accordingly, we conclude that the letters are hearsay,[11] and that their use implicated Lyle's right to confront and cross-examine the witnesses against him.[12]

Apparently assuming that the letters were hearsay with regard to Lyle, the Michigan Court of Appeals nevertheless rejected petitioner's confrontation argument primarily on the ground that "the letters were not inculpatory of defendant Lyles [sic]." *People v. Lyles* [sic], No. 77–1506 (Ct.App.1979). The Court of Appeals further stated that

---

10. Morgan discusses with approval the English case of *Wright v. Tatham,* 5 Cl. & Fin. 670, 7 Eng.Rep. 559 (H.L.1838), where the Exchequer Chamber and the House of Lords held inadmissible certain letters written to one Marsden, whose testamentary capacity was at issue in the case. Although the proponent of the letters argued that they should be admitted as circumstantial evidence reflecting their authors' belief that Marsden was sane, the judges held that since this use amounted to a direct assertion by the authors, the letters were hearsay. *See* E. Morgan, SOME PROBLEMS OF PROOF UNDER THE ANGLO-AMERICAN SYSTEM OF LITIGATION, 155–57 (1956); Morgan, *Hearsay Dangers and the Application of the Hearsay Concept,* 62 HARV.L.REV. 177, 207–08 (1948).

11. The dissent argues that this issue is controlled by the Supreme Court's decision in *Anderson v. United States,* 417 U.S. 211, 94 S.Ct. 2253, 41 L.Ed.2d 21 (1974) and this Court's opinion in *United States v. Gibson,* 675 F.2d 825 (6th Cir.) *cert. denied,* —— U.S. ——, 103 S.Ct. 305, 74 L.Ed.2d 285 (1982). *Post* at 436–438. Examination of both of these cases, however, reveals that neither of them presented a situation analogous to the instant case.

In *Anderson,* the Supreme Court held that two codefendants' perjured statements at an election contest hearing were not hearsay because the statements were not offered for their truth: "Quite the contrary, the point of the prosecutor's introducing those statements was simply to prove that the statements were made so as to establish a foundation for later showing through other admissible evidence that they were false," 417 U.S. at 220, 94 S.Ct. at 2260 (footnotes omitted). Thus, contrary to the dissent's assertion, *post* at 436, the proponent's purpose in introducing evidence is highly pertinent to the proper classification of the evidence as hearsay or not hearsay. The government in *Anderson* sought to introduce the codefendants' perjury as exemplifying the defendants' illegal activities; the precise substance of the perjured statements was inconsequential. In the instant case, by contrast, the prosecution sought to have the jury infer the defendants' guilt directly from the substantive message embodied in the letters themselves.

Nor does the *Gibson* case control. There we held that the instructions of the defendant's superior were not hearsay because they were not—and indeed, could not be—offered for their truth or falsity. Unlike Kemp's letters, however, the *Gibson* statements contained no implicit but inescapable assertion of fact. Their sole relevance lay in their possible effect on the defendant's state of mind before and during the commission of the crime, an issue without counterpart in the case at bar.

In the case at bar the prosecutor's purpose in introducing the letters is the same as the prosecutor's purpose in introducing the confession in *Bruton.* In both the alibi letters and the confession, the nontestifying codefendant is saying in an extra-judicial statement "my codefendant and I are guilty." Thus, unlike *Anderson* and *Gibson* where the mere existence of the statements and not their purpose is the relevant point, here the relevant point is for the jury to infer directly from the statements that "Lyle and I are guilty"—the same message that the confession in *Bruton* conveyed.

12. Moreover, the letters do not fall within any recognized exception to the hearsay rule—either federal or state. Both federal and Michigan hearsay exceptions for co-conspirators' statements require that the statements be made in furtherance of the conspiracy rather than during the "concealment phase" of the conspiracy. *Krulewitch v. United States,* 336 U.S. 440, 443–44, 69 S.Ct. 716, 718–19, 93 L.Ed. 790 (1949); *People v. Trilck,* 374 Mich. 118, 132 N.W.2d 134, 138 (1965). *Cf. Dutton v. Evans,* 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970) (upholding state's use of co-conspirator's statements following arrest where state's co-conspirator exception extends to concealment phase of conspiracy).

"[t]here was no evidence that defendant Lyles [sic] was known as Rock, and the letters did not indicate that Rock was seeking improper alibi assistance." [13] *Id.* The state maintains that these findings are factual determinations entitled to a presumption of correctness under *Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981). Although we entertain some doubt as to the applicability of *Mata* to the instant case, we conclude that, even with such a presumption, the Michigan Court's finding that the letters did not incriminate Lyle cannot be sustained.

While the letters do not refer to Roger Lyle by name, both of them frequently mention an individual named "Rock." The letter to Newton instructed him to testify that he had observed "Rock" and Kemp being arrested together. Having already heard considerable testimony that Lyle was arrested with Kemp, the jury could not help but infer that "Rock" was in fact the defendant, Roger Lyle. Elaborating on the Michigan Court's second argument—that "the letters did not indicate that Rock was seeking improper alibi assistance"—the District Court asserted that "[i]n order for the jury to draw an inculpatory inference with respect to 'Rock' they would have to speculate that 'Rock' helped prepare the letters, that the letters' object was to procure fabricated alibi testimony, and that such object evidenced a guilty mind." *Lyle v. Koehler,* Civ. No. 80–74578, at 9 (E.D.Mich.1982). The close association between Lyle and Kemp—as evidenced by their simultaneous arrest shortly after the killings—necessarily invited the jury to extend the inference of Kemp's guilty mind to the substantive guilt of both defendants. Introduced into evidence at the very end of the government's case—after the close association between the defendants had been firmly established—the letters were indeed "powerfully incriminating" extrajudicial statements that "added substantial, perhaps even critical weight to the Government's case [against Lyle] in a form not subject to cross-examination." *Bruton v. United States,* 391 U.S. at 135–36, 127–28, 88 S.Ct. at 1627–28, 1623–24.[14]

We reach this conclusion despite the District Court's observation that, since Kemp did not directly confess his guilt in the letters, the incriminating guilty mind inference is not compelled. It is inconceivable that a jury could infer anything but guilt from letters outlining desired testimony in such detail and instructing each recipient to

13. The Michigan Court of Appeals also based its rejection of Lyle's confrontation claim on a waiver argument, noting that Lyle had "acquiesced in the extent of the editing done on them, and [that] any inference of the inclusion of another in the alibi could have been taken care of by editing." *People v. Lyles* [sic], No. 77–1506 (Ct.App.1979). The record, however, shows beyond any doubt that Lyle's trial counsel maintained an objection to admitting the letters in any form throughout the proceedings, an objection reflected in the following colloquy between the prosecutor and defense counsel regarding the presentation of the edited letters to the jury:

> MR. THOMAS: 84–A, Your Honor. I would ask if counsel has any more additions or deletions before it is presented to the jury.
> As I understand, they objected to the admission of the letter per se. The Court ruled on that and all counsel stipulated to this final form in chambers. This is the final form that will be given to the jury.
> MR. MARTIN: Your Honor, subject to my objection to the exhibits, themselves, I have no objection as to what is contained in the letters. Of course, my objection still remains. I do not want anything—I do not want the letters in completely, but I have stipulated if they are going to be read, they should be read in the content they are now given to me.

Tr. at 907.

Moreover, we note that the District Court did not invoke the state court's waiver argument in rejecting the claim, and that the government has failed to renew that argument in the appeal before this Court.

14. The dissent maintains that, even if the letters are hearsay, *Bruton* does not compel reversal because the letters were not "powerfully incriminating" with regard to Lyle. *Post* at 440–441. Thus, the dissent cites *United States v. Dady,* 536 F.2d 675, 678 (6th Cir.1976), where this Court held that because a codefendant's redacted statement incriminated the petitioner only when considered in conjunction with extrinsic testimony, no *Bruton* violation had occurred. Unlike the instant case, however, *Dady* involved a statement that made no mention of *any* individual other than the declarant.

destroy his letter to prevent it from "getting into the wrong hands." Furthermore, it is clear that this is precisely the inference that the state sought to obtain by introducing the letters.[15] In his summation, the prosecutor emphasized that, during its deliberations, the jury could request to examine any of the exhibits that had been admitted into evidence, including the letters. Summarizing his case against both defendants, the prosecutor stated:

> Ladies and gentlemen, the evidence in this case, the direct evidence, the direct eyewitness testimony, the circumstantial evidence, the fingerprint, the statement by Mr. Kemp to Mr. Reeder at the jail, *these letters which you can read as many times as you like,* the descriptions, the fact that the descriptions are all fit together, the description of Mr. Lyles [*sic*] being found with Mr. Kemp, being found in the vicinity of Mr. Johnson, Mr. Pussycat Johnson, all of these fit together on the question of guilt.

(emphasis supplied). Tr. at 945. Although under *Bruton,* no instructions limiting the jury's consideration of the letters to the case against co-defendant Kemp would have forestalled the violation in Lyle's case, the trial court's instructions actually reinforced the prosecutor's invitation for the jury to consider the letters when deciding Lyle's guilt or innocence. Leaving the decision whether to apply the letters against Lyle entirely up to the jury, the trial court instructed that "[e]ach defendant is entitled to have his case determined from evidence as to his own acts and statements and conduct and *any other evidence which may apply to him.* Tr. at 1028. (emphasis supplied).

That the jury had to draw a short chain of inferences in order to link the letters and Lyle's participation in the crime does not dissuade us from concluding that the letters constituted a substantial portion of the state's evidence against him. Apart from the letters, this evidence consisted of Price's identification, Lyle's presence with Kemp shortly after the crime in a car resembling the one seen leaving the scene of the shootings, and Lyle's proximity to a man believed to be Howard "Pussycat" Johnson immediately before the arrest. While this independent evidence might have sufficed to convince the jury beyond a reasonable doubt of Lyle's guilt, we conclude that the letters engendered a substantial risk that the jury would consider them in deciding that issue. *See Hodges v. Rose,* 570 F.2d 643 (6th Cir.), *cert. denied,* 436 U.S. 909, 98 S.Ct. 2244, 56 L.Ed.2d 408 (1978) (consideration of weight of independent evidence both improper.and unnecessary to determination of *Bruton* issue by trial court). Thus, we reject the holdings of the Michigan Court of Appeals and District Court that the letters were not inculpatory.

■ Lyle had the right to confront all of the witnesses against him. He had the right to cross-examine the author of the letters, to explore Kemp's motivation in writing them, to test his sincerity in the letters, and to illuminate any ambiguities that the letters contained. In short, Lyle was entitled to remove all of the dangers that have led courts to exclude hearsay evidence for the last three hundred years. *See* E. Morgan, *Some Problems of Proof under the Anglo-American System of Litigation* 108, 142–43 (1956) (hearsay engenders risks regarding declarant's sincerity, memory, perception, and ambiguity of intended statement).

The government's case was not sufficiently strong to justify a holding that the admission of the letters constituted error "harmless beyond a reasonable doubt." *See Parker v. Randolph,* 442 U.S. 62, 78, 99 S.Ct. 2132, 2142, 60 L.Ed.2d 713 (1979) (Blackmun, J., concurring); *Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). Appellant's petition for a writ of habeas corpus accordingly must be granted, and we reverse and remand the case to the District Court with instructions to take such action in the event that the state does not grant Lyle a new trial within a reasonable time.

---

**15.** *See supra* note 9.

DAVID S. PORTER, Senior District Judge, sitting by designation, concurring in part and dissenting in part.

I concur in the Court's holding that petitioner was not denied effective assistance of counsel or prejudiced by the prosecutor's impeachment of Kenneth Newton, *ante* at 427–429. However, while acutely aware of the high level of scholarship reflected by the majority's resolution of the confrontation issue, I must dissent from its holding on both significant points of that analysis. First, the Court's conclusion that the Kemp letters were hearsay because the "inferences they necessarily invite form an integral part" of the documents ignores the fundamental difference between hearsay and circumstantial evidence. Second, even were I to agree that a *Bruton* analysis was in order here, I would not conclude that such an analysis compels reversal on the facts of this case under existing precedent.

## I.

Petitioner and one Kemp were tried together for felony murder and assault with intent to kill.[1] While in jail awaiting his preliminary hearing, Kemp wrote letters to two friends, Kenneth Newton and Nelson Calhoun. The letters were smuggled out of the jail where Kemp was being held by Kemp's sister, Vyethel, who testified at trial and identified the letters.[2] The letters clearly sought the assistance of Newton and Calhoun in establishing an alibi for Kemp; they inferentially indicate his "guilty mind," and that was the prosecution's purpose in introducing them.

The letters sought to obtain fabrication of testimony; they were thus orders or instructions. As such, the letters did not contain any "express assertion of past fact," *Dutton v. Evans,* 400 U.S. 74, 88, 91 S.Ct. 210, 219, 27 L.Ed.2d 213 (1970), susceptible to proof or disproof. Rather, as the majority notes, "[b]elieving the alibi to be false, the prosecution obviously did not seek to introduce the letters in order to demonstrate the truth of the particular statements they contained." *Ante* at 432. However, the majority has concluded that the letters are to be characterized as hearsay, even though appearing to concede that they were not offered for the truth of the matters they assert, rather, they have concluded that "the inferences they necessarily invite form an integral part" of the documents. *Ante* at 432–433. Thus, the panel has concluded that the "matter[s] asserted" by the letters included the inferences which the prosecutor wished the jury to draw from them; *i.e.,* the very fact which made them relevant also rendered them hearsay. I cannot agree with the majority's conclusion.

Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

Rule 801(c), Fed.R.Evid.; Rule 801(c), Mich. R.Evid. Today's decision drastically alters the meaning of the last clause of the rule. As review of the cases reveals, there has been little doubt in the past that the "mat-

1. "Joint trials are favored for the reason of judicial economy," *United States v. Hackett,* 638 F.2d 1179, 1187 (9th Cir.1980), *cert. denied,* 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981), and in this Circuit, "a petitioner must show both an abuse of discretion and prejudice from denial of a severance motion" (or, as in this case, granting of a motion to consolidate) to be entitled to relief by collateral attack. *Jenkins v. Bordenkircher,* 611 F.2d 162, 168 (6th Cir.1979), *cert. denied,* 446 U.S. 943, 100 S.Ct. 2169, 64 L.Ed.2d 798 (1980). For the reasons discussed *infra* p. 443, I conclude that joinder was properly granted in this case (an issue not addressed by the majority by virtue of its resolution of the confrontation claim).

2. Portions of the letters were redacted prior to their admission, a fact which the majority does not mention. While the record before us does not reflect what portions of the letters were deleted or contain the letters as written, it seems fair to conclude that the trial court was aware of the potential for a *Bruton* problem, and proceeded in a manner consistent with cases holding that redaction of material which clearly incriminates a codefendant is an appropriate method of "sanitizing" extrajudicial statements. *See United States v. Dady,* 536 F.2d 675, 678 (6th Cir.1976) (*per curiam*). However, in light of my conclusion that the letters are not hearsay, redaction was not necessary at all under the confrontation clause.

ter asserted" was the matter asserted by the writing or speech, not the matter asserted by the proponent of the evidence.[3]

In *Anderson v. United States,* 417 U.S. 211, 94 S.Ct. 2253, 41 L.Ed.2d 21 (1974), the Supreme Court affirmed the conviction of an individual who had been charged with stuffing ballot boxes. At a joint trial, the district court admitted evidence that two defendants had perjured themselves at a local inquiry into the elections. Anderson appealed his conviction on the basis that the assertedly hearsay statements of his codefendants should not have been used at a joint trial because they inferentially inculpated him.

The Court rejected petitioner's entire argument. Justice Marshall wrote:

The obvious question that arises in the present case, then, is whether the out-of-court statements of Tomblin and Browning were hearsay. We think it plain they were not. Out-of-court statements constitute hearsay only when offered in evidence to prove the truth of the matter asserted. The election contest testimony of Tomblin and Browning, however, was not admitted into evidence in the [district court] to prove the truth of anything asserted therein. Quite the contrary, the

point of the prosecutor's introducing those statements was simply to prove that the statements were made . . . .

*Id.* 417 U.S. at 220, 94 S.Ct. at 2260 (footnotes omitted). I believe that *Anderson* constitutes an express rejection of the majority's premise that classification as hearsay may properly be grounded upon the inferences the proponent of the evidence seeks to have drawn.[4] The majority has determined that *Anderson* is not controlling here because the Court refers to "the point of the prosecutor's introducing" the nonhearsay statements. *Ante* at 433 n. *11.* The majority concludes that this illustrates that it is appropriate to consider the inference sought by the proponent of the evidence when conducting a hearsay analysis. However, the *inference* sought by the prosecution in *Anderson* was that the defendants were guilty because the statements were made, there being no other logical explanation for them. It seems to me that *Anderson* demonstrates that hearsay analysis focuses on just what Rule 801 mandates: whether the statements were offered for their truth. As the Court further noted,

[h]ere, since the prosecution was not contending that anything Tomblin said at the election contest was true, the other defendants had no interest in cross-exam-

---

**3.** The majority appropriately notes that the question whether or not the letters were hearsay is "exceedingly close." *Ante* at 432–33. I agree that resolution of the differences between Wigmore and Morgan is difficult. This is shown by the thoughtful exposition of the relative positions of these two eminent scholars in the majority opinion. The result is to remove verbal acts from the realm of nonhearsay in certain instances. The rule governing when such acts should be considered hearsay will be difficult to apply because it is difficult to comprehend. One will have to examine the proffered evidence and determine whether it is an assertion, why it is offered, and whether the reason for which it is offered constitutes an assertion. If this sort of analysis is required as a matter of constitutional law in the implementation of the confrontation clause, then so be it. However, I cannot reconcile this with the rules and decided cases, especially *Bruton,* where the Court "emphasize[d] that the hearsay statement inculpating petitioner was clearly inadmissible against him under traditional rules of evidence." 391 U.S. at 128 n. 3, 88 S.Ct. at 1623 n. 3 (citation omitted). Along with the

fact that the codefendant's statement implicating the defendant was inherently untrustworthy, the fact that it was inadmissible under traditional rules of evidence was one of the reasons the Court found as it did.

**4.** Anderson was, of course, a conspiracy case. However, the Court stated that "the prior testimony was . . . admissible simply if relevant in some way to prove the conspiracy charged." *Id.* at 221, 94 S.Ct. at 2261. I do not read this phrase as enunciating a rule applicable only to conspiracy prosecutions; rather, the Court was, I believe, stating that, where evidence is in fact not hearsay, it is admissible as substantive evidence to prove whatever facts are at issue (given relevance and authenticity, neither of which appear to be disputed here). *See also United States v. Hackett,* 638 F.2d 1179 (9th Cir.1980), *cert. denied,* 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981) (concluding that because statements were not hearsay, "it was not necessary that they were in furtherance of the conspiracy in order to be admissible against the other defendants").

ining them so as to put their credibility in issue.

*Anderson,* 417 U.S. at 220, 94 S.Ct. at 2260 (footnote and citations omitted).

Similarly, Lyle had no interest in cross-examining Kemp to put Kemp's credibility in issue. Lyle did not need cross-examination to argue that there was no evidence that he had anything to do with the letters, or that he even knew of them. The letters are simply circumstantial evidence of Kemp's guilty conscience. They were not offered to prove the truth of anything contained in them. Hence I see no ground for distinguishing *Anderson.*

In *United States v. Hackett,* 638 F.2d 1179 (9th Cir.1980), *cert. denied,* 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981)—one of the cases cited by the majority in this case, *ante* at 432—the court held that a nontestifying codefendant's post-arrest exculpatory statements were not hearsay as against either defendant. The court concluded that the false exculpatory statements

> were admitted not for their truth, but *merely for the fact that the statements were made.* Combined with other evidence showing Turner's statements to be false, the mere fact that Turner made them implied his consciousness of guilt. The agent who recounted Turner's statements was available for cross-examination on whether Turner in fact made them. Thus, cross-examination of Turner was not necessary to protect Hackett's confrontation right on the question whether Turner in fact made the statements.

*Id.* at 1187 (citations omitted; emphasis supplied).

Finally, this Court has recently considered whether or not evidence of an individual's instructions or requests to another constitutes hearsay, and concluded that it did not. In *United States v. Gibson,* 675 F.2d 825 (6th Cir.1982), the district court in petitioner's trial for embezzlement had excluded, as hearsay, testimony that petitioner's superior had given him an instruction which inferentially explained part of petitioner's conduct. In ruling that the exclusion was erroneous, this Court held that

> [w]e have no doubt that the statement should have been received. First, the hearsay rule bans in-court repetition of extra-judicial utterances *only when they are offered to prove the truth or falsity of their contents.* This rule does not apply to statements offered to show merely that they were made. [The statement] was not offered to show that the substance of ... the utterance was true or false. *Indeed, a suggestion or an order is not subject to verification because such utterances do not assert facts* .... [The excluded testimony] was testimony about a circumstantial utterance ....

*Id.* at 834 (emphasis supplied).

The *Gibson* analysis plainly covers this case, and should control our decision today. Kemp's letters were "suggestions" and thus "not subject to verification at all." The letters were "circumstantial utterances," and so were not "offered to prove the truth or falsity of their contents." The statements in *Gibson* were simply circumstantial evidence from which the jury could infer petitioner's innocence. The Kemp letters were also circumstantial evidence from which the jury could have drawn whatever inferences flowed from them, just as would be true of any other piece of circumstantial evidence.

The crux of my difficulty with the panel's position that the Kemp letters were hearsay is that by blurring the distinction between hearsay and circumstantial evidence, we are not only removing a valuable arrow from the prosecutor's sling, but, I believe, extending the hearsay rule in a manner which is totally inconsistent with its fundamental purpose.[5] Because the letters were not

---

5. As the Advisory Committee notes state the point,

> If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay .... The effect is to exclude from hearsay the entire category of 'verbal acts' ... in which the

hearsay, the state was entitled to their introduction for whatever purpose it wished—including the inferences which the majority finds to have been engrafted to them.[6] It is well established that false exculpatory statements may be used as substantive evidence of guilt. *See e.g., United States v. Holbert,* 578 F.2d 128, 129 (5th Cir.1978) and cases cited therein.[7] The rule is a salutary one, since such evidence is just as important with regard to the defendant's state of mind as evidence of, for example, flight.

In fact, flight to avoid prosecution has from time to time been itself analyzed as a hearsay question. In *United States v. Lobo,* 516 F.2d 883 (2d Cir.) (per curiam), *cert. denied,* 423 U.S. 837, 96 S.Ct. 65, 46

L.Ed.2d 56 (1975), the appellant's codefendant fled during trial, and the trial court permitted the trial to continue. Appellant argued that *Bruton* was violated by the continuation of the trial. In rejecting his argument, the court noted that

> [w]hile a flight, even though nonverbal conduct, has been said to be an assertion (in the form of an admission) of guilt ... it is treated in the Federal Rules of Evidence as a 'statement' but because it is an admission as 'not hearsay' .... *Preferably it is to be viewed as conduct offered as circumstantial evidence* rather than for its assertive, testimonial value.

*Id.* at 884 n. 1 (emphasis supplied).[8]

I see no substantial difference between flight as circumstantial evidence of guilt

---

statement itself affects the legal rights of the parties *or is a circumstance bearing on conduct affecting their rights.*

App. foll. 28 U.S.C., Rule 801 at ¶ 5 (emphasis supplied). Lyle's letters are clearly an example of a case in which "the statement itself ... is a circumstance bearing on conduct affecting" the rights of the parties, it being well established that evidence of false exculpatory statements are properly received into evidence for inferential evidence of guilt. *See, e.g., ante* at 432. Thus, by holding that it is the intention of the party propounding the evidence, instead of the content of the evidence itself, which is determinative in a hearsay analysis, today's decision sets the clearly stated position of the Advisory Committee on its ear.

6. In *United States v. Wilson,* 532 F.2d 641 (8th Cir.), *cert. denied,* 429 U.S. 846, 97 S.Ct. 128, 50 L.Ed.2d 117 (1976), notebooks found in an apartment used as a heroin "house" tended to corroborate the prosecution's version of the defendants' drug-related activities. In response to defendants' contention that the notebooks constituted inadmissible hearsay, the court concluded that

> "we view the declarations in the notebooks as utterances, *used circumstantially,* giving rise to the indirect inference that the apartment was the scene of drug sales and related activity. Furthermore, as the government contended at trial ... *the existence of the notebooks and the fact of these entries* served to corroborate [the testimony of a prosecution witness]. It is the fact that the statements were written, and not the truth of the statements, which was relevant."

*Id.* at 646 (emphasis in original; footnotes and citations omitted).

In *Wilson,* as in the case before us, the statements of one codefendant were circumstantial-

ly relevant, and so admissible, as to all defendants, because the statements were not hearsay and were therefore to be evaluated just as any other evidence would be.

7. Of course, there is always the possibility that evidence of false exculpatory statements or other circumstances would be too prejudicial to a codefendant to permit the trial to go forward without severance, although no cases so holding have been found. However, the standard which would control such a situation is the same as that which governs severance under other circumstances, and is wholly unrelated to the confrontation clause. Similarly, the trial court could, upon request, consider the matter under Rule 403, Fed.R.Evid. or its state-law equivalent, *see* Rule 403, Mich.R.Evid., which permit a trial court to exercise its discretion to exclude relevant but overly prejudicial evidence.

8. I do not think that the Advisory Committee Note to Rule 801(a), cited by the Second Circuit, is support for the proposition that flight "is treated in the Federal Rules of Evidence as a 'statement.'" The Note states that "nonverbal conduct ... may be offered as evidence that the person acted as he did because of his belief in the existence of the condition sought to be proved," App. foll. 28 U.S.C., Rule 801(a)—a statement which applies with equal force to flight and to the conduct of Kemp in the case at bar. Judge Weinstein states that "[f]light is almost never intended as an assertion of guilt, but is designed for purposes of escape. Thus it is not a statement under Rule 801(a) and it is not hearsay." 4 Weinstein's Evidence ¶ 801(a)[02] n. 13. That statement also fully covers the situation at bar.

and Kemp's letters as circumstantial evidence of guilt. In each case, a defendant committed an act which is reasonably interpreted as consistent with guilty knowledge. The *Lobo* court's conclusion that evidence of flight "is to be viewed as conduct offered as circumstantial evidence" is in no way less applicable here because the case at bar concerns a writing.

Thus, in my opinion, today's decision is one with implications which go well beyond *Bruton,* and which have nothing whatsoever to do with the confrontation clause. The rule enunciated by the majority is in effect a prohibition of the use of circumstantial evidence of a defendant's guilt in a joint trial where that evidence, while squarely implicating only one defendant, arguably spills over and implicates the codefendant.

## II.

My second area of disagreement with the majority's analysis is that I do not believe that, even were *Bruton* properly applicable to this case, it would compel suppression of the Kemp letters. In order to develop this, I believe it necessary to expand upon the majority's brief description of *Bruton* (*ante* at 431–432).

Bruton and Evans were tried jointly on charges of armed postal robbery. Evans had orally confessed to a postal inspector that he, Evans, and Bruton had committed the robbery. The postal inspector was permitted to testify as to the confession. The jury was charged that the confession was competent evidence only as against Evans, and could not be considered by them as against Bruton. Both defendants were convicted; Evans' conviction was reversed because the confession was improperly admitted against him, but Bruton's conviction was left standing.

The Court reversed Bruton's conviction, holding that

... Evans' oral confessions were in fact testified to, and were therefore actually in evidence. That testimony was legitimate evidence against Evans and to that extent was properly before the jury during its deliberations. Even greater, then,

was the likelihood that the jury would believe Evans made the statements and that they were true—not just the self-incriminating portions but those implicating petitioner as well. Plainly, the introduction of Evans' confession added substantial, perhaps even critical weight to the Government's case in a form not subject to cross-examination, since Evans did not take the stand. Petitioner thus was denied his constitutional right of confrontation.

*Bruton,* 391 U.S. at 128, 88 S.Ct. 1623. There were three aspects to the *Bruton* holding, each of which are entitled to consideration in determining whether a case such as this falls within its purview.

First, of course, the decision rested upon the crucial mandate that the confrontation clause be given meaning through the exclusion of evidence of confessions by a nontestifying codefendant because of unavoidable and potentially profound spillover. However, the Court made clear that its decision rested on more than one base. The opinion "emphasize[s] that the hearsay statement inculpating petitioner was clearly inadmissible against him under traditional rules of evidence" (*Id.* at 128 n. 3, 88 S.Ct. at 1623 n. 3), and found that Evans' statement was "powerfully incriminating" to Bruton (*Id.* at 135, 88 S.Ct. at 1627).

Finally, the Court noted that

[n]ot only are the incriminations [of the co-defendant] devastating to the defendant but their credibility is inevitably suspect, a fact recognized when accomplices do take the stand and the jury is instructed to weigh their testimony carefully given the recognized motivation to shift blame onto others. The unreliability of such evidence is intolerably compounded when the alleged accomplice, as here, does not testify and cannot be tested by cross-examination. It was against such threats to a fair trial that the Confrontation Clause was directed.

*Id.* at 136, 88 S.Ct. at 1628 (footnotes omitted). Thus, the *Bruton* holding was based upon the inability to confront one's accuser;

the nature of the confession as clear hearsay against Bruton; the "powerfully incriminating" nature of Evans' confession as against Bruton; and the "inevitably suspect" nature of the confession of an accomplice, who has a clear motive to implicate others so as to minimize his own role in the crime charged.

My primary disagreement with the majority's analysis of this case under *Bruton,* assuming *arguendo* that such analysis is proper in the first place, is that I simply do not agree that the Kemp statements are "powerfully incriminating" under any approach to the meaning of that phrase used by the courts to date. Instead of examining the statements on their face, the Court has concluded that

> [I]ntroduced into evidence at the very end of the government's case—after the close association between the defendants had been firmly established—the [Kemp] letters were indeed 'powerfully incriminating' extrajudicial statements that 'added substantial, perhaps even critical weight to the Government's case [against Lyle] [sic] in a form not subject to cross-examination.' *Bruton v. United States, supra,* 391 U.S. at 135–36; 127–28, 88 S.Ct. at 1627–28; 1623–24.

*Ante* at 436. I am at odds with this conclusion. As the district court noted, the letters contained no assertion of guilt; rather, they each assert that Kemp was being "framed." They do not identify Lyle by name; rather, they use a nickname, which in light of other testimony adduced at trial, the jury could associate with Lyle. They in no way indicate that Lyle was involved in the search for fabricated alibi testimony, but simply include Lyle in the

scenario regarding which Kemp wished to have his associates testify.[9] *Lyle v. Koehler,* Civil No. 80–74758 (E.D.Michigan, March 18, 1982) (Slip Op. at 8–9).

In short, the letters, standing alone, do not even begin to implicate petitioner in the murders. It is only upon the introduction of other evidence—the eyewitness identification, the simultaneous arrest—that the letters arguably inculpate petitioner. By holding that a *Bruton* violation can occur upon introduction of a codefendant's false exculpatory statements which implicate the petitioner only inferentially and only upon introduction of substantial additional evidence, we have gone well beyond the limits this and other courts have placed upon *Bruton. See United States v. Burke,* 700 F.2d 70, 85 (2d Cir.1983), citing *United States ex rel. Nelson v. Follette,* 430 F.2d 1055 (2d Cir.1970) (*Bruton* claims dismissed where codefendant's statement does not independently implicate the appellant); *United States v. Greenleaf,* 692 F.2d 182, 189 (1st Cir.1982) (corroboration of government's case by codefendant's extrajudicial statements does not implicate *Bruton*); *United States v. Kendricks,* 623 F.2d 1165, 1167 (6th Cir.1980) (quoting *Parker v. Randolph,* 442 U.S. 62, 73, 99 S.Ct. 2132, 2139, 60 L.Ed.2d 713 (1979); " '[t]he Confrontation Clause has never been held to bar the admission into evidence of every relevant extrajudicial statement made by a nontestifying declarant simply because it in some way incriminates the defendant' ").

I am also at odds with the majority's failure to take note of the difference between confessions, as involved in *Bruton,* and Kemp's letters. As this point really

---

**9.** I have particular difficulty with the Court's conclusion that the inference of Lyle's guilt was compelled by the fact that the letters put Kemp and "Rock" together at the time of their arrest. It was a fact in evidence that they were arrested together; any attempt at an alibi by either which did not take account of that fact would have been patently specious. Thus, the only inference which I see as necessarily drawn—assuming that the jury concluded that "Rock" was petitioner—is what they already knew; that petitioner and Kemp were arrested together. *See United States v. Gullett,* 713 F.2d 1203

(6th Cir.1983) (references to a codefendant which violated *Bruton* "must be taken in context [of other evidence] to appreciate their prejudicial value; the case was "clearly distinguishable from cases in which the inadmissible hearsay statements represented the only proof of an essential element of the alleged offense" (at 1213 (citations omitted)); *United States v. Dady,* 536 F.2d 678 (6th Cir.1976) (*per curiam*) (no *Bruton* violation where inferences of guilt are possible only through consideration of evidence extrinsic to redacted confession of codefendant).

goes to the heart of my concern with the classification of these letters as hearsay, I shall not belabor it here. However, I think it clear that, as already noted, an essential part of the holding in *Bruton* was that the confession of the codefendant

> is inevitably suspect, a fact recognized when accomplices do take the stand and the jury is instructed to weigh their testimony carefully given the recognized motivation to shift blame onto others. The unreliability of such evidence is intolerably compounded when the alleged accomplice, as here, does not testify and cannot be tested by cross-examination. It was against such threats to a fair trial that the Confrontation Clause was directed.

391 U.S. at 137, 88 S.Ct. at 1628 (footnotes and citation omitted).[10]

In *United States v. Kendricks,* 623 F.2d 1165, 1167 (6th Cir.1980), this Court considered the above-quoted passage from *Bruton* to provide a firm rationale for the admission of coconspirator's statements, made in the furtherance of the conspiracy, even though no conspiracy had been charged. *Id.* at 1168 n. 1.

I do not wish to suggest that any coconspirator's exception applies here. *See ante* at 433 n. 11. However, I believe that the statements here are endowed with the same strong indicia of reliability that the Court noted in *Kendricks,* and that this factor militates against application of the *Bruton* rule here, as it did in that case. Here, the letters were not a confession, as is the challenged testimony or document in virtually all *Bruton* cases; in fact,[11] as the district court noted, they begin with the assertion that Kemp was being framed. *Lyle,* Civil No. 80–74578, Slip. Op. at 8. They were not statements made to officials in hope of advancing Kemp's own cause, potentially at the expense of petitioner's, as is intuitively true in the event of a confession. Rather, they were an attempt to conceal the criminal activity altogether—not to minimize it or shift the blame for it. They were, thus, simply not unreliable as indicators of the guilt of either defendant, in light of the other evidence adduced at trial.[12]

10. [T]he particular vice that gave impetus to the confrontation claim was the practice of trying defendants on 'evidence' which consisted solely of *ex parte* affidavits or depositions secured by the examining magistrates, thus denying the defendant the opportunity to challenge his accuser in a face-to-face encounter in front of the trier of fact. *California v. Green,* 399 U.S. 149, 156, 90 S.Ct. 1930, 1934, 26 L.Ed.2d 489 (1970). Thus, the right to confrontation attaches when the defendant might be able to challenge the accuser's statement at trial. *A fortiori,* when as in the case of circumstantial evidence, there is no challenge to which the evidence is susceptible, there is no benefit to be derived from examination; thus the purposes of the clause are not advanced. "The test ... is whether 'under the circumstances, the unavailability of the declarant for cross-examination deprived the jury of a satisfactory basis for evaluating the truth of the extra-judicial statement." *Hackett,* 638 F.2d at 1186. I am at a loss as to what petitioner could conceivably have accomplished through cross-examination of Kemp. The letters stood on their own, susceptible to neither embellishment nor impeachment. Of course, the defendant will, in the case of such evidence, be able to cross-examine the individual who propounds or authenticates the evidence; here, petitioner was able to cross-examine the woman who ferried the letters from Kemp's jail cell to his friends.

11. As noted above, I believe that the letters were properly admitted as against petitioner, because they were not hearsay. It would be disingenuous to suggest that their admission was harmless error in the event that the Court's hearsay analysis is in fact correct. However, I believe that even were that analysis accurate, the letters were not "powerfully incriminating" and were otherwise not excludable under *Bruton.* Rather, I believe that petitioner's "argument boils down to a claim that [he] would have had a better chance of acquittal in a separate trial at which [the letters] would have been excluded." *United States v. Lord,* 565 F.2d 831, 839 (2d Cir.1977). That is, of course, not compelling. *Id.* Therefore, their admission, even if hearsay, was not a violation of *Bruton* at all.

12. While the majority analysis is couched in terms of *Bruton,* and so appears to apply only to circumstantial evidence generated after the crime charged (e.g., concealment, flight), I see no significant distinction between such evidence and evidence of a defendant's behavior prior to the crime which spills over to the codefendant. I can only conclude that under the rule we establish today, the notebooks con-

### III.

Of course, despite the foregoing, reversal would be appropriate had the trial court erred in granting the prosecution's motion to consolidate petitioner's and Kemp's cases for trial. I doubt that my belief that the motion was properly granted will come as a surprise; nonetheless, I briefly consider the point.

As the district court noted, not only was this a case in which both defendants were charged with precisely the same crimes, but "petitioner's argument that he should have been granted a severance because of his co-defendant's incriminating statements loses much of its force when it is recognized that those statements were not *Bruton* violations." *Lyle,* Civil No. 80–74578, Slip Op. at 10–11. As I agree with this conclusion, I also agree with the resolution of the issue by the district court.

I suspect that, given the majority's conviction that no cautionary instruction on the use of the letters would have been sufficient to cure the *Bruton* violation it has discerned in this case,[13] the majority would also conclude that consolidation was, here, an abuse of discretion. However, because I do not perceive the instant case as rising to the level of a *Bruton* violation, I similarly do not perceive this as a case in which consolidation "was so prejudicial that the [trial] court could have exercised its discretion in only one way." *Hackett,* 638 F.2d at 1187. Therefore, I conclude that, based upon my understanding of the law in this area as it was before today's decision, there was no error in granting the prosecution's motion to consolidate petitioner's case with that of Kemp for purposes of trial.

sidered in *Wilson, supra,* n. 6, would be inadmissible as against the codefendants absent a conspiracy charge. Thus, the Court is providing prosecutors with an incentive to tack on a conspiracy count in order to gain admission of evidence which would be, under today's holding, otherwise inadmissible, or to accede to severance in every case where evidence is to be introduced which was generated by only one defendant.

**13.** The majority apparently faults the trial court here for not having given a cautionary jury instruction on the use of the Kemp letters,

I would affirm the judgment of the district court.

while noting that "no instructions ... would have forestalled the violation in Lyle's case." *Ante* at 434–435. I note both that counsel for petitioner specifically stated that "we do not request any further instructions nor do we object to any of the instructions as given," Tr. 1054, and that given the current level of frank awareness with regard to the efficacy of limiting instructions, *see Bruton,* 391 U.S. at 129–133, 88 S.Ct. at 1624–1626 and accompanying notes, the Court is putting trial courts in the position of having to make a Hobson's choice with regard to the use of such instructions.