In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-3554

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

TIMOTHY G. WHITEAGLE,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Western District of Wisconsin,
No. 11-cr-65-wmc — **William M. Conley**, *Chief Judge.*

ARGUED JUNE 6, 2013 — DECIDED JULY 21, 2014

Before WOOD, *Chief Judge,* and POSNER and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* A jury found Timothy G. Whiteagle guilty of (among other offenses) bribing and conspiring to bribe a Ho-Chunk Nation legislator in order to secure favorable treatment for three different vendors wishing to do business with the Nation. The district court ordered him to

serve a prison term of 120 months. Whiteagle now appeals his conviction and sentence. We affirm.

## I.

The Ho-Chunk Nation of Wisconsin, known formerly as the Wisconsin Winnebago Nation, is a federally recognized Indian tribe headquartered in Black River Falls, in the west-central region of the State. About half of the Nation's roughly 7,200 enrolled members live in Wisconsin. Among the Nation's four branches of government, its legislature possesses the authority to enter into contracts on behalf of the Nation. Clarence Pettibone served as one of those legislators from 1995 until 2011. During the time period relevant to this case, the legislature was comprised of eleven elected representatives; the total has since been enlarged to thirteen.

The Ho-Chunk Nation has been active in the gaming industry for over 30 years. Judge Crabb's decision in *Oneida Tribe of Indians of Wisconsin v. Wisconsin*, 518 F. Supp. 712, 719–20 (W.D. Wis. 1981), held that once Wisconsin's constitution was amended in 1973 to legalize bingo games licensed by the State, the State ceded its authority to restrict and regulate bingo on Native American reservations. Thereafter, many of Wisconsin's tribes and bands turned to bingo halls as a source of badly-needed revenue. The Ho-Chunk Nation established its first such hall in 1983, in a used trailer on tribal land in the Wisconsin Dells. *See* Bill Lueders, Wisconsin Center for Investigative Journalism, *Casino profits give Ho-Chunk new outlook*, WIS. STATE JOURNAL, Mar. 3, 2014, at A1. With the Supreme Court's decision in *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 107 S. Ct. 1083 (1987), congressio-

nal enactment the following year of the Indian Gaming Regulatory Act, P.L. 100-497, 102 Stat. 2467 (1988), and Wisconsin's creation of a state lottery in 1987, the door was opened to the operation of full-fledged casinos by the tribes. By June 1992, the Governor of Wisconsin had entered into gaming compacts with all eleven of the State's tribes and bands, including the Ho-Chunk Nation, authorizing a range of gaming activities at tribal casinos including blackjack, electronic video games, slot machines, and "pull-tab" gambling tickets. Today, the Nation operates a network of six casinos in the State, at sites in or near Black River Falls, Madison, Nekoosah, Tomah, Baraboo (Wisconsin Dells), and Wittenburg. Wis. Legislative Reference Bureau, Research Bull. 97-1, *The Evolution of Legalized Gambling in Wisconsin* 21-27 (Sept. 1997).

The casinos have proven to be highly lucrative for the Ho-Chunk Nation. Currently it nets over $200 million annually from its gambling operations. The profits have enabled the Nation to establish a relatively generous set of benefits for its members, including annual per-capita stipends of $12,000 for adults and one-time payouts of up to $200,000 from a children's trust fund when a youth turns 18 and graduates from high school. *See* Lueders, *Casino profits give Ho-Chunk new outlook*; *Ho-Chunk may change how they dole out trust funds*, DAILY HERALD (Arlington Hts., Ill.), May 6, 2014.

Cash Systems, Inc.

The large amount of revenue generated by casino gaming naturally attracts vendors seeking a share of the pie, along with influence peddlers who claim an ability to pave the way for such vendors among tribal officials. Cash Systems, Inc. fell into

the former category. Cash Systems was one of a number of firms that specialize in what are described as cash-access or cash-resources services, which principally involve issuing cash to casino customers via automated teller machines and kiosks, check-cashing, and credit- and debit-card advances. (Cash Systems was acquired by a competitor in 2008 after it lost its contract with the Ho-Chunk Nation.) Key to the profitability of casino operations is maximizing the amount of cash on the casino floor—in other words, cash that customers have in their hands ready to spend. This is why cash-access services are important to casino operators: by making it easy for customers to access cash on the spot, they encourage customers to gamble away more of their money. In the early 2000s, Cash Systems was ahead of its peers in some of the services that it offered: it not only had the ability to process cash advances against a customer's credit or debit card, but it was pioneering the use of hand-held, mobile devices that enabled cash-access transactions to take place anywhere on the casino floor.

Timothy Whiteagle fell into the category of influence peddlers. Whiteagle, a member of the Ho-Chunk Nation, held himself out as an insider whose relationships with other tribal members and legislators offered interested vendors an entrée into the tribe's governance and gaming operations and, once there, a means of preserving the firm's business relationship with the tribe. Whiteagle conducted his business in part through his limited-liability company, Wolfbow Big Game Sources.

Cash Systems engaged Whiteagle in 2002 as a confidential consultant as the company was attempting to win a contract with the Nation to provide Ho-Chunk casinos with cash-access

services. (Cash Systems was already serving as a subcontractor to the Nation's existing cash-access vendor, Bank Plus.) The firm agreed to pay Whiteagle a monthly salary of $22,500. Whiteagle's job was to engage in a behind-the-scenes effort to win the contract and, once the Nation engaged Cash Systems as its vendor in 2002, to help maintain that relationship. Cash Systems served as the Nation's cash-access services vendor for the next six years. During that time, it reaped over seven million dollars in revenue from the services it provided to the Nation. And over the course of those six years, it paid Whiteagle just under two million dollars.[1] That figure included both Whiteagle's monthly salary as well as a series of payments that Whiteagle solicited from Cash Systems on Pettibone's behalf. The total represented nearly 30 percent of the company's gross revenue on the contract.

The "in" with the tribal legislature that Whiteagle held out to Cash Systems was his relationship with Clarence Pettibone. Whiteagle's and Pettibone's parents were related and their families had known and socialized with one another for many years. Pettibone, as we have noted, had been serving in the Ho-Chunk legislature since 1995. During his tenure, he served on the legislature's finance and development committees and twice held the office of Vice President of the Nation. Pettibone

---

[1]   Revenues were derived from the transaction fees that customers were charged for check cashing, cash advances, and other services. A Cash Systems employee would later testify that the company reaped a total of $6 million in fees on a total of $235 million in transactions processed in one year at Ho-Chunk casinos. Of that $6 million, Cash Systems passed along $4 million to the Nation, paid approximately $500,000 in fees to credit and debit card companies, and kept the balance of $1.5 million for itself.

was actively involved in cash access services. As Ho-Chunk legislator Ona Garvin testified, "If it had anything to do with check cashing, Clarence was on it." R. 187 at 66. Whiteagle represented to Cash Systems personnel that he would secure Pettibone's assistance in having Cash Systems selected (and maintained) as a vendor to the Nation by convincing Pettibone to serve as Cash System's champion in the Ho-Chunk legislature.

Cash Systems was one of three firms seeking to become the Nation's new cash-access vendor in 2002. The government presented testimony at trial indicating that when the matter came before the Ho-Chunk legislature in May 2002, there was no true consensus among the legislators as to which company among the three should be selected. As it turned out, a vote on the matter was called when a legislator who was outspoken in his opposition to Cash Systems left the chamber. Pettibone moved that the legislators present give their preliminary approval to enter into a contract with Cash Systems. The motion carried unanimously.

Whiteagle's mission from this point forward was to ensure that the contract with Cash Systems was finalized and to preserve the company's status as the Ho-Chunk Nation's cash-access vendor. To that end, he and Pettibone conferred regularly on the company's status with the Nation and specifically regarding the possibility that Cash Systems might be replaced by another cash-access provider. Kristine Fortney, who was married to Pettibone from 1994 to 2008, could remember overhearing at least 20 such conversations between her husband and Whiteagle. As Fortney recalled the discussions, Whiteagle would give Pettibone advice, if not instruc-

tion, as to what needed to be done to preserve Cash Systems' position. Whiteagle also wrote multiple emails to Pettibone giving him advice on how to ward off potential competitors to Cash Systems. *See*, *e.g.*, Gov. Exs. 3-1(c) - (f). In one email, Whiteagle warned Pettibone that the two of them had to get a Cash Systems competitor "killed off" or they would "pay big time soon." Gov. Ex. 3-2(b). A natural inference from that statement is that Pettibone, like Whiteagle, stood to suffer financially if Cash Systems lost its contract with the Nation.[2]

Over the course of the next six years, Whiteagle would periodically ask Cash Systems personnel for money, over and above his monthly salary, to pay Pettibone, with the express purpose of ensuring that Pettibone would pursue favorable treatment for Cash Systems in the Ho-Chunk legislature. On occasion, Whiteagle would ask that these amounts be added to the balance of a series of loans Whiteagle had taken from the company. Cash Systems typically would accede to the requests, usually issuing the payments to Whiteagle's LLC. Whiteagle in turn converted the bulk of the payments into cash or cashier's checks. So in most instances, there is no direct evidence confirming that Whiteagle in fact transmitted the money to Pettibone. And as we shall see, one of Whiteagle's arguments is that he was simply shaking down Cash Systems for money that he kept for himself, and that he in fact never bribed Pettibone. As the ensuing account reveals, there

---

[2] There was also some testimony that Whiteagle attempted to remove the political opponents of himself and Pettibone (and Whiteagle's clients) from the Ho-Chunk legislature. For example, he tried to have legislator Ona Garvin recalled, although the recall effort failed.

certainly is ample evidence that Whiteagle told Cash Systems personnel he was bribing Pettibone; there is also, as we have just mentioned, substantial evidence that Whiteagle strategized with Pettibone as to the company's status as a vendor to the Nation. Although the proof confirming that Pettibone actually was bribed is, not surprisingly, less extensive, there is nonetheless sufficient evidence confirming that Pettibone had a corrupt relationship with Whiteagle and, in fact, was bribed to give favorable treatment to Cash Systems.

Bearing that out is the available documentary evidence confirming the transmission of at least some financial benefits from Cash System to Pettibone.

Between September 2002 and May 2006, Cash Systems wrote three checks that were directly payable either to Pettibone or to Park Institute Black River Falls ("Park Institute"), a charitable organization that operated the small tae kwon do school that Pettibone operated to serve Ho-Chunk children. The record indicates that one of these payments, a check for $10,000 to Park Institute, was written at the specific behest of Whiteagle. In September 2005, Roscoe Holmes, an employee of Cash Systems, sent an email relaying Whiteagle's request to John Glaser, who had just been hired as the company's Executive Vice President for Sales and Marketing. Holmes described Pettibone to Glaser as "our allies [sic] political proponents [sic] at Ho-Chunk Nation" and indicated that the solicited donation to Pettibone's tae kwon do school was intended to "maintain[ ] the good faith relationship we have developed and … help foster a more direct bond from a mutually gratifying prospective [sic]." Gov. Ex. 6-1. Cash Systems issued the check to Park Institute three weeks later.

Apart from such direct payments between Cash Systems and Pettibone's charity, Park Institute, there is also some evidence supporting an inference that the cash payments that Whiteagle solicited from Cash Systems on behalf of Pettibone were transmitted by Whiteagle to Pettibone. For example, on May 5, 2003, Cash Systems wired $6,000 to Whiteagle; and on the same day, Whiteagle withdrew $4,000 from his account to obtain a cashier's check in that amount payable to Pettibone (which Pettibone subsequently cashed). Gov. Ex. 16-2. One week later, Pettibone, in his capacity as the Ho-Chunk Nation's Vice-President, signed a final, one-year renewable contract with Cash Systems, formalizing the Nation's relationship with the company.[3] Financial records document at least four other instances in which there were wire-transfers of money by Cash Systems to Whiteagle, followed by the purchase of cashier's checks or money orders payable to Pettibone by Whiteagle. *See* Gov. Exs. 16-3 (wire transfer of $7,000 to Whiteagle, followed by Whiteagle's purchase of $5,000 cashier's check payable to Pettibone); 16-7 (wire transfer of $8,000 to Whiteagle, followed by Whiteagle's purchase of $5,000 cashier's check to Pettibone); 16-9 (wire transfer of $22,500 to Whiteagle, followed by Whiteagle's purchase of a $1,500 cashier's check to Pettibone); Gov. Exs. 16-4 & 16-5 (wire transfer of $4,267 to Whiteagle, followed by Whiteagle's issuance of $2,600 check to his daughter, who worked as his bookkeeper; his daughter in turn

---

[3] Representatives of Cash Systems later took Pettibone and Whiteagle out to celebrate at a Minneapolis strip club, spending more than $27,000 to entertain the two men over the course of two and a half hours. "It [was] unethical, but we did it," Cash Systems' Brian Johnson later testified. R. 155 at 4.

cashed the check and purchased five money orders each in the amount of $500 payable to Pettibone).

Cash Systems and its proponents (including Whiteagle and Pettibone) were taken by surprise in the Spring of 2006 when the President of the Ho-Chunk Nation, as head of its executive branch, unilaterally replaced Cash Systems with Certegy, a competitor in the cash-services field. Whiteagle emailed Brian Johnson at Cash Systems on May 2 reporting that "I talk[ed] to our man last night and he will be talking to the prez … but he said the prez couldn't do that . . . . . . . . . . to sign the contract. I will be in Wittenberg today at the Legislative Meeting to make sure CS doesn't get kicked out." Gov. Ex. 9-4. (CS, of course, stood for Cash Systems.) On May 13, Pettibone cashed a $1,500 cashier's check from Whiteagle dated April 29, 2006. Three days later, Pettibone moved in the legislature to both terminate the contract with Certegy and reinstate the agreement with Cash Systems, arguing to his colleagues that the contract with Certegy had been signed improperly without the requisite legislative review. Both of his motions carried unanimously. But Cash Systems was reinstated on a month-to-month basis only; gone was the renewable one-year contract it had previously enjoyed.[4]

Cash Systems naturally wanted to regain the security of a longer-term contract. Whiteagle advised Cash Systems personnel that in pursuit of that goal, he needed additional funds to assure Pettibone's support for the company. In late

---

[4] Cash Systems previously had held a right of first refusal that enabled it to meet the more favorable terms that another vendor might offer to the Nation.

December 2006, Whiteagle sent an email to Glaser, Cash Systems' Executive Vice-President, advising him of a proposal that he had discussed with Pettibone over the Christmas holiday. Whiteagle indicated that Pettibone was prepared to shepherd a two-year contract with Cash Systems through the Ho-Chunk legislature the following March; Pettibone (whom Whiteagle referred to by the initial C) believed he had the votes necessary in the legislature to approve such a contract. In return, Pettibone expected financial support from Cash Systems:

> To do this, funds for his Mother who is suffering terribly from diabetes are needed for her future treatment at home. She has lost several fingers already. C wanted $17,750.00 for diagnostic and treatment equipment so her trips for Dialysis in Marshfield Wisconsin are limited. It[']s a very extreme hardship for the family and C. to take his mother to Marshfield Wisc. everyday at 6am which is a 120 mile roundtrip.

> Plus C. would need $14,000 for his political campaign in January 2007.

> These funds would be added to my $75,000 loan from CS. Wisconsin state campaign laws do not apply to reservation properties as proven over the years thru US Supreme rulings. This amount would be an addendum to my loan agreement or contract with CS. I want to pay for these expenses and help C. as he has help[ed] me and CS for nothing. I can

> send these funds to him based upon ancient tribal custom and C. being a blood relative of mine.
>
> I stress to CS this is my strategy to get the CS contract signed in March 2007.

Gov. Ex. 3-3(c) at 1 (emphasis in original). Cash Systems complied with the request by wiring the requested amounts of $14,000 and $17,750 to Whiteagle in early January; and records reveal that after the first of the two wire transfers was complete, Whiteagle immediately withdrew $1,500 in cash from his bank account. Gov. Exs. 16-17(a) & (b).

Similar requests from Whiteagle and payments by Cash Systems became a pattern over the next 18 months. Whiteagle would contact Cash Systems indicating that Pettibone needed additional money, typically for his campaign. In a number of emails, Whiteagle emphasized how important Pettibone was to the interests of Cash Systems. Pettibone's ongoing need for campaign funds "cost little money compare[d] to what he is capable of doing for us," Whiteagle wrote in a February 2007 email. Gov. Ex. 3-1(i). He added, more ominously, "**If C is out CS is out**." *Id.* (emphasis in original). In a June 2007 email asking for an $8,000 advance on his monthly salary to help defray legal expenses that Pettibone had incurred in connection with his campaign, Whiteagle admonished Glaser that the ability of Cash System to stay on as the Nation's cash-access provider depended on Pettibone's reelection ("I[f] we don't have C we don't have a man inside to protect and promote our interests.") and that Pettibone would not overlook the favor. ("C doesn't forget a favor . . . . . . . ever!!!!") Gov. Ex. 4-10. In a February 2008 email, Whiteagle sounded a note of urgency,

indicating that he needed $7,500 right away to prevent a vote against Cash Systems in the legislature. "I need to do my work," Whiteagle wrote. "Each day gets worse as Mr. C is only one man and he is doing his best. By me working to lobby on CS['] behalf and get the support for Mr. C.[—] that has been a winning and financially rewarding formula." Gov. Ex. 9-13.

Cash Systems complied with these requests and remained as the Nation's cash-access vendor until 2008, although the promised two-year contract never did materialize. Typically, wire transfers to Whiteagle were followed in short order by cash withdrawals by Whiteagle. And in one instance the evidence indicates that Whiteagle used the withdrawn funds to purchase roughly $1,500 worth of buttons and other campaign materials for Pettibone.

In seeking these and other payments from Cash Systems, Whiteagle frequently sought the assistance of Johnson, who worked as an account manager in Cash Systems' customer service department. Johnson, who found it frustrating to deal with these requests, asked Whiteagle to reward him with a 25-percent cut of the amounts Whiteagle received. Whiteagle agreed. Over time, the kickbacks to Johnson amounted to more than $31,000. These payments would ultimately prove to be a key piece of evidence in the undoing of the scheme.

After Glaser joined Cash Systems and became familiar with Whiteagle's periodic requests for funds to pay Pettibone, he asked that Whiteagle support his requests with invoices in order to give the appearance that the payments were reimbursements for legitimate expenses. Whiteagle complied with Glaser's request by submitting invoices for items such as

advertising, travel, legal, and promotional expenses. The invoices were false, as Whiteagle himself later admitted in his testimony, and their falsity was almost immediately apparent to Johnson, as the invoices were typically handwritten and devoid of receipts and other backup documentation. Yet, the company nonetheless honored the invoices and paid Whiteagle the requested amounts.

Money Centers of America

Notwithstanding the significant sums of money that Cash Systems was paying to Whiteagle and Pettibone, its status as the Nation's cash-access vendor came to an end in mid-2008, when the Nation replaced Cash Systems with Money Centers of America ("MCA"). As it turned out, at the same time Whiteagle was telling Cash Systems he was working on its behalf, he was also working on behalf of MCA.

Whiteagle had been introduced to MCA's CEO, Chris Wolfington, in 2005. Soon thereafter, Whiteagle agreed to become a behind-the-scenes consultant for MCA. Wolfington arranged to pay Whiteagle for his services through Support Consultants, a consulting company owned by Kevin MacDonald. MacDonald had arranged the introduction between Whiteagle and Wolfington. According to MacDonald, MCA through Support Consultants ultimately paid Whiteagle a total of more than $650,000 between July 2008 and September 2009. MCA's director of corporate administration, Lauren Anderson, would later describe the indirect method of paying Whiteagle as "unique" in her experience with MCA and its outside consultants. R. 178 at 28.

MCA made an initial bid for the Nation's business in 2006, but was unsuccessful: Cash Systems remained as the Nation's provider of cash-access services. Nonetheless, MCA perservered in its efforts to establish a business relationship with the tribe, and toward that end, Wolfington maintained his behind-the-scenes relationship with Whiteagle. Ultimately, in 2008, the legislature voted to replace Cash Systems with MCA.

As with Cash Systems, Whiteagle would periodically make demands of MCA on Pettibone's behalf (as well as his own), although, so far as the record reveals, Whiteagle and Pettibone were not actually paid anything until the company obtained the contract in 2008. Nonetheless, Whiteagle made multiple demands—mostly for cash—before MCA was awarded the contract. In February 2007, for example, Whiteagle solicited a payment of $40,000 for Pettibone's re-election campaign, reminding Wolfington in an email that "[o]ur man C. did a lot for you over the months" and admonishing him that "C needs cash now not promises." Gov. Ex. 4-2. There is no evidence that MCA complied with this particular demand, and, indeed, an email that Whiteagle sent to Wolfington on March 10, 2008, suggested that while he and Pettibone were optimistic about MCA's prospects with the Ho-Chunk Nation, it was past time that the company finally demonstrate some financial appreciation for both Whiteagle and Pettibone:

> Altho its been a while for you to get in the door with the HCN we have kept our word , you are in!! We have devoted many months to prepare your way into the HCN without pay and be assured the next 5 days will determine what we do next with you with the HCN. Mr. C and I have discussed this

> thoroughly too that [i]f what you say changes and it[']s a continued pattern we will need to review our relationship. …

Gov. Ex. 4-20 at 1 (emphasis in original). Pettibone was copied on this email.

A key point that distinguished MCA's bid for the Nation's business was its willingness to offer the Nation a license of its propriety "ONswitch" software, which would enable the Nation at some point in the future to provide its own cash-access services. In the March 10 email to Wolfington, Whiteagle had also suggested that MCA seek an up-front fee of $2.5 million for that license. "The tribe can be very fickle," Whiteagle would later testify in explaining why he suggested that MCA insist on payment in advance. R. 182 at 67. On March 19, Pettibone made a motion in the Ho-Chunk legislature to approve the recommendation of the Nation's business department that the Nation enter into a contract with MCA. That motion, which carried unanimously, paved the way for negotiation of the contract terms.

Whiteagle continued to demand that Wolfington reward himself and Pettibone for their assistance with the MCA contract. In mid-March, he began to press Wolfington to hire Pettibone's cousin, Jon Pettibone, at an annual salary of $50,000. Jon Pettibone had been working for Cash Systems in a managerial position. In June, having still not heard whether Wolfington would comply with the request, Whiteagle sent two emails to Wolfington indicating that Pettibone wanted to know when "[Jon] P. or JP" would be hired, Gov. Ex. 4-32, and asking Wolfington to let Whiteagle know so that he could relay

the information to Pettibone, Gov. Ex. 4-33. After the second of these emails, Wolfington hired Jon Pettibone at the requested salary of $50,000 per annum. Although it was not uncommon for MCA to hire some of its predecessor's employees, MCA's Anderson would later testify that the decision to hire Jon Pettibone puzzled her, as he was ostensibly hired to do the same job that an existing employee (who in Anderson's view was "excellent") was already doing. R. 178 at 23. For his part, Whiteagle would later testify that he was lying when he said that Pettibone had requested or had anything to do with the employment of his cousin.

Money also remained a recurring topic of Whiteagle's communications with MCA during this time period. For example, a March 21, 2008 email to Wolfington stated:

> Of course we know our brother will make it right and we trust you. But I think we should have a reasonable portion of … everything [i.e., the increase in MCA's value as a result of its contract with the Ho-Chunk Nation] in cash. What is your suggestions?????????
>
>  … I strongly suggest we are treated well. HOW-EVER. . . . . If you aren't going to do anything we need to know that now … and soon too. Your silence will be taken as a NO.

Gov. Ex. 4-22. In reply to the email, Wolfington suggested that Whiteagle telephone him the following week to discuss the matter. Gov. Ex. 4-23.

On June 16, 2008, MCA signed a contract with the Ho-Chunk Nation. The news prompted Whiteagle to send an email to Wolfington which closed as follows:

> SEND THE CONTRACT TO ME WITH SIGNA-TURES. . . . . . MR. C AND I ARE GOING TO HAVE LUNCH. . . . AND IT[']S HIS VICTORY TOO. . . . YAAAAAAAAAA!!!!

Gov. Ex. 4-31.

At this point, however, the Ho-Chunk legislature had not yet signed off on payment to MCA. On July 12, 2008, Whiteagle advised Wolfington by email that a special legislative meeting regarding the MCA contract was likely to take place the following week. Whiteagle asked Wolfington to provide him with any negative information Wolfington had regarding an MCA competitor, so that he could pass the information along to Pettibone.

On July 16, 2008, the Ho-Chunk legislature approved payment in the total amount of $4,535,700 to MCA for cash-access services, including the $2.5 million upfront fee for the license of MCA's ONswitch software. Pettibone seconded the motion that resulted in that action. MCA received its payment shortly thereafter. Two days later, MCA wired $309,600 to Support Consultants; and on the day after that, Support Consultants wired $261,900 to Whiteagle. (MacDonald retained the difference as a referral fee for having introduced Whiteagle and Wolfington, but he kicked back $10,000 of that amount to Wolfington.) On the same day he received those funds, Whiteagle had his bank issue a cashier's check payable to

"Park Institute BRF" in the amount of $45,000. We shall have more to say about that particular check below.

The Nation terminated MCA's contract in late August, 2009. MCA continued making payments to Whiteagle until shortly after that date.

Trinity Financial Group

Trinity Financial Group ("Trinity"), a Kentucky financial services firm, was interested in entering into a contract with the Ho-Chunk Nation to finance the construction of housing on tribal lands and to provide mortagages to the Nation's members. Much of the Nation's housing stock was substandard, and the demand for housing far exceeded the available supply: the Nation had a waiting list for housing that encompassed more than 1,000 families. At the same time, many of the mortgages on exisiting homes, which were underwritten by the Nation itself, were in arrears. The Nation had issued a request for proposal or RFP seeking an outside company to take over the Nation's mortgage portfolio. Trinity was pursuing a much more ambitious, multi-million dollar contract with the Nation that would not only assume responsibility for the mortgages on existing homes but which also proposed a dramatic expansion of the Nation's housing stock through the construction of 1,200 new homes over a period of several years, at a cost to the Nation of $125,000 per home. Trinity stood to make several million dollars in profit from the sweeping contract it was proposing.

In 2006, Deborah Atherton, who at the time had a romantic relationship with Whiteagle, entered into a consulting arrangement with Trinity. Atherton was charged with identifying

someone in the Ho-Chunk legislature who would champion Trinity's interests, and Trinity agreed that it would pay Atherton up to $650,000 in consulting fees if Trinity succeeded in obtaining the contract it sought with the Ho-Chunk Nation. Whiteagle helped Atherton draft the contract with Trinity and played an active, behind-the-scenes role in Trinity's effort to do business with the Nation. When Whiteagle and Atherton met with Trinity's CEO in the Spring of 2006, Whiteagle remarked that his role had to remain secret; otherwise, he warned Trinity, the firm might not get in the door with the Nation.

In April 2006, Trinity's representatives came to Wisconsin to meet with Atherton and Whiteagle. Whiteagle in turn arranged to have the representatives meet Pettibone over dinner at an Olive Garden restaurant. When Pettibone arrived at the restaurant, he asked Whiteagle in front of the others, "Are these the ones you want me to pick?" R. 188 at 28. Whiteagle replied, "Yes, these are the ones I want you to pick." *Id.* Whiteagle assured the Trinity representatives that Pettibone had the votes in the Ho-Chunk legislature "to get it pushed through with his people," R. 188 at 28–29, although Whiteagle added that he had to make sure their opponents did not block a vote. Later, in the Fall of 2006, Atherton told Fortney (Pettibone's wife at the time), that she wanted to give Pettibone $100,000 "if everything goes through with the Legislature getting Trinity in." R. 185 at 134–35. Fortney later told Pettibone what Atherton had said (although Atherton had asked her not to). According to Fortney, Pettibone had no response, audible or visible, to Fortney's revelation.

Trinity's aggressive proposal met with resistance in the Ho-Chunk legislature. Apart from a reluctance among tribal

officials to outsource the development and financing of housing, Trinity likely did itself no favor by submitting a proposed budget to the Nation's attorney which included a $650,000 line-item for "consulting fees." (This, of course, was the amount Trinity had agreed to pay Atherton and Whiteagle.) When he learned about that submission, Whiteagle emailed Trinity's CEO, Brent Frederickson, expressing the hope that the Nation's legislature had not seen that budget and reminding Frederickson that he had previously suggested on multiple occasions spreading the consulting fees among other budget items in a way that "doesn't identify us"—*i.e.*, that would hide the consultants and the fees they were to be paid. Gov. Ex. 21-1(a).

In view of the opposition to the proposal, when Pettibone met privately with Frederickson in November 2006, he suggested that Trinity pursue a much more modest contract with the Ho-Chunk Nation at that time. Specifically, Pettibone suggested that Trinity propose to conduct a preliminary study to assess the Nation's housing needs. Pettibone asked whether Trinity could perform such a study for $250,000, and Trinity's CEO agreed that it could. Whiteagle understood the smaller contract as "a prelude, a door-opener" to the much larger project that Trinity had proposed. R. 189 at 92.

Thereafter, on November 21, 2006, Pettibone moved in the Ho-Chunk legislature to approve entering into a contract with Trinity to conduct the sort of housing study he had discussed with the company's CEO. That motion carried, and the Nation entered into the agreement with Trinity. Trinity thereafter paid Atherton and Whiteagle a smaller consulting fee commensurate with the magnitude of the contract it had entered into.

When Trinity received its initial payment of $125,000 from the Nation in December 2006, it conveyed $19,000 of that amount to Atherton's company, Thoroughbred Business Solutions, and Atherton in turn split the fee with Whiteagle. As it turned out, however, the subject of a reward for Pettibone's assistance became a bone of contention between Trinity and its consultants.

Whiteagle wanted to give Pettibone a Pontiac Firebird that he had acquired earlier in 2006 in acknowledgement of the help that Pettibone had given to Trinity in securing the contract, and Whiteagle wanted $6,000 from Trinity as reimbursement for the cost of the car. When Atherton relayed the request to David Payne, a contractor who was working for Trinity as a kind of Man Friday, Payne rejected the idea as "total bribery." R. 188 at 38. "It's not going to happen," Payne told Atherton. *Id.* Whiteagle himself then contacted the company's CEO by telephone and instructed him in no uncertain terms to comply with the request. "He just told me that I was going to pay the money," Frederickson testified. R. 187 at 150. He described Whiteagle's tone as "angry and threatening." *Id.* Atherton pursued a more conciliatory approach with the CEO, proposing that Trinity pay Whiteagle $3,000 immediately and the balance two months later, with the money flowing through Atherton's consulting firm. "Obviously, no funds/gifts can be directly given to Clarence," Atherton wrote in an email, "but they can be channeled through Thoroughbred Business Solutions, LLC as a bonus." Gov't Ex. 21-1(b). Atherton stressed that the "bonus" was necessary to "keep Clarence happy" and to "keep Clarence's support." *Id.* "Bottom line is, it has to be done." *Id.* (In a later email, she noted that Whiteagle

was displeased by Frederickson's resistance and had communicated his displeasure to Pettibone.) Trinity's CEO continued to view the proposed payment as a bribe, and refused to contribute any funds to the Firebird. He described himself as "shocked and angry" with Atherton's email. R. 187 at 151. Frederickson instructed Atherton to communicate with him thereafter only in writing; and he admonished his staff not to communicate at all with Atherton or Whiteagle.

Whiteagle nonetheless gave the Firebird to Pettibone as he had intended, conveying title to the car through his (Whiteagle's) daughter. When Pettibone brought the car home in the Summer of 2007, he told his family it was a gift from Whiteagle. Fortney angrily admonished her husband that the gift could be construed as a bribe. The car was later discovered in Pettibone's possession during the execution of a search warrant on a storage locker leased by Pettibone. Whiteagle and his daughter would later testify that the Firebird was given to Pettibone with the intent that it be raffled off to benefit the tae kwon do school; but Fortney and others testified that they were aware of no such plan.

Trinity went on to complete its housing study for the Ho-Chunk Nation. When the firm received the balance of the $250,000 that the Nation had agreed to pay Trinity for the study in January and March 2007, Atherton in turn received $38,000, which she again shared with Whiteagle. Trinity remained interested in doing additional business with the Nation, and Atherton and Whiteagle continued to pursue that possibilty with Pettibone throughout 2007 and into 2008.

In August 2007, Payne, who had found himself out of work and in dire straits financially after Trinity's work with the Nation came to an end, worked briefly for Whiteagle as a personal trainer. On one occasion during that period, when Payne, Atherton, and Whiteagle were in the kitchen of Whiteagle's home, Whiteagle asked Payne to deliver to Pettibone a brown paper bag containing cash. Payne balked, telling Whiteagle, "I can't do that, Tim . . . . It's wrong. It's bribery. I can't do it." R. 188 at 59. Whiteagle told Payne, "You need to do this. This is how deals are done up here," R. 188 at 58, and walked away from Payne. The two had a falling out not long after that incident, and Payne left Whiteagle's employ.

During the summer of 2008, Atherton was still in pursuit of another contract for Trinity. In a July 15, 2008, email to Pettibone, Atherton acknowledged that there was no money in the Ho-Chunk budget for housing at that time, nor was there any interest within the legislature for pursuing the construction of senior housing, another possibility that Trinity had pursued. Atherton nonetheless assured Pettibone in explicit terms that if the door were opened to a follow-up contract for Trinity, he would benefit financially:

> Clarence, if personal compensation was/is a concern for you, let me put your mind at ease. . . We cannot compensate you outright, as in a direct payment, however, Trinity can pay me, then I can compensate you, we must be careful to protect your position as paying you directly is a criminal offense… What ever arrangement you have with anyone else, I can assure you, the Trinity team will beat. . . . . Would $5000 to $7000 a month contribution to T.K.D. [an

> apparent reference to Pettibone's tae kwon do school] be satisfactory? Dave [Payne] will personally see to this … And another thing. . . . you would have never been out of the loop for supporting elder housing with the Trinity team … you were and still are always included … in compensation.

Gov. Ex. 10-1. In an email to Whiteagle the following month regarding an elder-housing proposal from another client, Bailey & Associates, Atherton addressed the need to compensate Pettibone, telling Whiteagle, "Sandwiched in between the compensation for all parties involved, Mr. C will be 'taken care of' discretely." Gov. Ex. 4-38.

Ultimately, however, the efforts to secure additional work for Trinity went nowhere; and by the summer of 2008, the Federal Bureau of Investigation was hot on the trail of Whiteagle and his co-conspirators.

As early as July 2007, federal agents were looking into the relationship between Whiteagle and Cash Systems. That month, FBI agents approached Cash Systems' Brian Johnson and asked him whether he had received any money from Whiteagle. (Recall that Whiteagle had been giving kickbacks to Johnson on the payments that Johnson had helped him obtain from Cash Systems.) Johnson lied to the agents and told them he had not. Several days later, Johnson met Whiteagle at a gasoline station and told him about the interview. Whiteagle advised Johnson to tell the FBI that the sums of money he had given to Johnson were loans.

By the following summer, the FBI had obtained records documenting the payments from Whiteagle to Johnson. When

they confronted Johnson with the proof, he admitted that he had lied previously to them, confessed to the kickbacks, and agreed to cooperate with the investigation of Whiteagle. Among other things, he gave the FBI access to his email correspondence with Whiteagle.

Fortney, Pettibone's soon-to-be ex-wife, also came to the aid of the government's investigation. While snooping on her husband's computer in mid-July 2008, she discovered Atherton's July 15 email discussing the possibility of compensating Pettibone in the event Trinity were able to obtain another contract with the Nation. She printed a copy of the email and delivered it to the FBI.

On August 5, 2008, agents executed a search warrant at Whiteagle's home. They imaged the contents of his personal computer and, as a result, obtained copies of his electronic correspondence with Cash Systems, MCA, Atherton, and Pettibone. Separately, agents also discovered the Pontiac Firebird that Whiteagle had given to Pettibone in the storage locker that Pettibone had leased.

When Pettibone was interviewed by federal agents, he denied any knowledge of Whiteagle's affairs. Specifically, he professed ignorance of what Whiteagle did for a living, whether Whiteagle had any business relationship with Cash Systems, whether Whiteagle had received any money from Cash Systems, and whether Whiteagle and Atherton had any relationship with Trinity.

We noted earlier that when the Ho-Chunk legislature approved compensation in the amount of more than $4.5 million to MCA in July 2008, Whiteagle received compensation

from MCA in the amount of $261,900 through Support Consul-
tants. On the same day that he received that money, Whiteagle
obtained a cashier's check in the amount of $45,000 payable to
Park Institute BRF, the charitable organization that funded
Pettibone's tae kwon do school. Whiteagle was still in posses-
sion of that cashier's check the following month, when the
search warrants were executed on both his home and
Pettibone's. Apparently, Whiteagle concluded that it was not
in his interest to turn the check over to Pettibone's charity. In
December 2008, Whiteagle created a new company by the
name of "Park Institute Black River Fund, Ltd." and opened a
new bank account in that company's name. He then deposited
the cashier's check into that account, and then withdrew most
of the proceeds from the acccount in cash.

Nearly three years later,[5] a grand jury indicted Whiteagle,
Pettibone, and Atherton on charges that they had conspired in
violation of 18 U.S.C. § 371 to commit the offense of bribery in
connection with the contracts that Cash Systems, MCA, and
Trinity entered into with the Ho-Chunk Nation. The indict-
ment also charged all three defendants with engaging in
substantive acts of bribery in violation of 18 U.S.C. § 666.
Whiteagle was also charged with tax offenses, as a result of his
failure to report his income to the Internal Revenue Service,
and with witness tampering, based on his advice to Brian
Johnson to tell the FBI that the kickbacks he had given to
Johnson were loans. Pettibone pleaded guilty to corruptly
accepting the Pontiac Firebird from Whiteagle with the intent

---

[5] The delay was apparently due to the difficulty of assembling the
extensive document trail.

to be influenced in connection with the Trinity contract, in violation of section 666(a)(1)(B). Separately from the indictment in this case, Atherton had been charged along with Whiteagle of conspiring to fraudulently obtain a loan. She ultimately pleaded guilty to that charge, but in pleading guilty stipulated to the facts establishing her participation in the corrupt efforts on behalf of Trinity to enter into contracts with the Ho-Chunk Nation.

For his part, Whiteagle maintained his innocence and proceeded to trial, where he testified in his own defense. Confronted with his own emails, Whiteagle admitted that he had solicited money and other things of value for Pettibone from the three companies who had hired him. But he denied that he had ever transmitted any bribes to Pettibone, that Pettibone had made any of the demands for money and other things of value that Whiteagle had presented to his clients as if they were made on Pettibone's behalf, or that Pettibone had entered into any corrupt agreement with him (and Atherton) to favor his clients in the Ho-Chunk legislature. Whiteagle insisted that both Pettibone and he had advocated for Whiteagle's clients based on what they believed to be the genuine merits of those clients as vendors to the Ho-Chunk Nation. He also denied having the influence over Pettibone that he had represented to his clients. And he explained the demands for money he had made of his clients, purportedly on Pettibone's behalf, as resulting from his own insatiable desire for money. "Clarence never asked me for a dime," Whiteagle testified. R. 189 at 4.

> [I]t was my own personal greed. I just wanted to keep the money coming. It was like an intoxication and I misused his name terribly. Terribly.

R. 182 at 123.

After an eight-day trial, a jury found Whiteagle guilty on all twelve counts of the superseding indictment in which he was named.

At sentencing, the district judge calculated Whiteagle's offense level using the bribery guideline rather than the guideline governing gratuities; he also determined that the loss resulting from the bribery offenses was between $2.5 million and $7.0 million, and increased Whiteagle's offense level accordingly. Finding that Whiteagle had committed perjury when he testified at trial, the judge also enhanced Whiteagle's offense level for obstruction of justice. As a result of these determinations, the Sentencing Guidelines advised a sentence in the range of 235-292 months. The court ordered Whiteagle to serve a sentence of 120 months, explaining its decision to impose a below-Guidelines sentence as follows:

> The court would have little trouble imposing a sentence within the guideline range but for consideration of the defendant's age and medical conditions; the fact that this is his first real encounter with the criminal justice system; the sentences and lack of prosecution of others involved in these crimes; and the extreme sums of money that are regularly paid to lobbyists and others, as well as contributed to campaigns, by special interest groups ostensibly to influence legitimately, rather than corruptly, the

votes of public officials at virtually every level of government in this nation. Even so, the defendant was the ringleader of a blatantly deliberate, calculated and elaborate scheme not just to influence, but to bribe and sell a key tribal legislator's support and votes. For that, he is deserving of a substantial form of imprisonment. Taking into consideration these factors pursuant to §§ 5H1.1, 5H1.4 and 5K2.0 of the guidelines, as well as § 3553(a) of Title 18, I am persuaded that a custodial sentence of ten years is reasonable and no greater than necessary to satisfy the statutory purposes of sentencing. Such a sentence will reflect the seriousness of the offense, serve to hold the defendant accountable, provide the defendant the opportunity for rehabilitative programs and achieve parity with the sentences of similarly situated offenders.

R. 213 at 5; *see also* R. 225 at 31–32.

## II.

Whiteagle does not challenge his convictions on the tax charges or on the charge of witness tampering. His appeal is focused on his convictions on the conspiracy and substantive bribery counts of the superseding indictment. Primarily because Whiteagle believes there is little or no evidence establishing Pettibone's knowing participation in the charged conspiracy and acts of bribery, Whiteagle contends that the evidence is insufficient to support his own convictions on those counts. He also argues that the district court committed prejudicial error in allowing into evidence the falsified invoices

he submitted to Cash Systems as well as the false protestations of ignorance that Pettibone made when he was first interviewed by the FBI. Last, he challenges the district court's estimation of the loss amount for sentencing purposes, as well as its decision to treat the moneys conveyed to Pettibone as bribes rather than gratuities.

## A. Sufficiency of the Evidence

We begin our review with Whiteagle's challenge to the sufficiency of the evidence underlying his convictions on the conspiracy and substantive bribery counts. In addressing these claims, we are, of course, obligated to view the evidence in the light most favorable to the government. *E.g.*, *United States v. Garcia*, — F.3d —, 2014 WL 2624809, at *6 (7th Cir. June 13, 2014). Only if no jury could find the essential elements of the offense beyond a reasonable doubt will we reverse the conviction. *E.g.*, *United States v. Chapman*, 692 F.3d 822, 825 (7th Cir. 2012).

### 1. Conspiracy

Count 1 of the superseding indictment charged Whiteagle with violating 18 U.S.C. § 371 by engaging in a conspiracy with Pettibone, Atherton, and others to commit an offense against the United States, namely bribery in violation of 18 U.S.C. § 666.[6] The government's theory of the case was that Whiteagle conspired to solicit bribes for Pettibone from the companies wishing to do business with the Ho-Chunk Nation in exchange

---

[6] Our references and citations to the superseding indictment are to the superseding indictment as redacted for the jury, which involved some renumbering of the counts. R. 94-1.

for Pettibone's efforts as a member of the Nation's legislature to secure favorable treatment for the interested companies.

To convict Whiteagle of this charge, the jury had to find that there was an agreement to commit an illegal act (in this case, bribery), that Whiteagle knowingly and deliberately became a party to that agreement, and that he or a co-conspirator committed an overt act in furtherance of the conspiracy. *E.g.*, *United States v. Jones*, 371 F.3d 363, 366 (7th Cir. 2004). The essence of conspiracy, of course, is the agreement to commit an offense, *e.g. United States v. Vallone*, — F.3d —, 2014 WL 1999034, at *6 (7th Cir. May 16, 2014), and this agreement may be proved circumstantially, *e.g.*, *United States v. King*, 627 F.3d 641, 651 (7th Cir. 2010).

In view of the evidence, it would be difficult, to say the least, for Whiteagle to contend that he was not engaged in an effort to market Pettibone's services as a Ho-Chunk legislator to companies willing to pay bribes to Pettibone, through Whiteagle, in exchange for Pettibone's efforts. Whiteagle's own statements and emails held himself out as Pettibone's agent, demanding cash and other remuneration on Pettibone's behalf in exchange for the action that Pettibone would take or had taken on the companies' behalf in the legislature.

Whiteagle instead contends that Pettibone was wholly unaware that Whiteagle was soliciting bribes on his behalf, that he had no knowledge of the charged conspiracy, and that Pettibone never accepted a bribe, because Whiteagle pocketed all of the money. This is not an uncommon defense in bribery cases: the middleman who has solicited a bribe on behalf of a public official contends that he was merely puffing or

"rainmaking"when he held himself out as an agent of the official, the aim being to extract money from someone hoping to corruptly influence the official and keep the bribes for himself, without the official knowing of or participating in the scheme. *See*, *e.g.*, *United States v. Shields*, 999 F.2d 1090, 1099 (7th Cir. 1993) (citing *United States v. Turchow*, 768 F.2d 855, 864 (7th Cir. 1985)).

As the government points out, the possibility that Pettibone might not have known what Whiteagle was doing or agreed to accept bribes does not necessarily foreclose the possibility that the conspiracy existed and that Whiteagle was guilty of participating in that conspiracy. The jury could have found that Whiteagle agreed with one or more officials of a company wishing to do business with the Nation (Glaser and Johnson of Cash Systems, for example, or Wolfington of MCA) to bribe Pettibone, and that the company transmitted a bribe to Whiteagle for that purpose, without having to additionally find that Pettibone was, in fact, bribed. *Cf. Vallone*, 2014 WL 1999034, at *6 (as it is the agreement to commit a crime that is the essence of conspiracy, proof that conspiracy succeeded in its illicit aim is not a prerequisite to conviction) (citing *United States v. Jimenez Recio*, 537 U.S. 270, 274–75, 123 S. Ct. 819, 822 (2003)). The ample evidence regarding Cash Systems' efforts to obtain favorable treatment in the Ho-Chunk legislature by complying with Whiteagle's multiple demands for money to pay Pettibone, for example, would have supported such findings. But, contrary to Whiteagle's argument, there was

indeed sufficient evidence that Pettibone not only knew of, but participated in, the charged conspiracy.[7]

To begin with, Whiteagle's emails and other statements represented that it was Pettibone on whose behalf Whiteagle was soliciting bribes and promising favorable treatment in the Ho-Chunk legislature in exchange for those bribes. As a member of that legislature, Pettibone obviously was in a position both to exercise his own vote in favor of a vendor wishing to do business with the Ho-Chunk Nation and to use his influence to persuade his colleagues in the legislature to do the same. Although Whiteagle testified that he was lying when he said that he was soliciting bribes on Pettibone's behalf, the jury of course was not required to believe him. It could have accepted at face value the representations that Whiteagle made to the vendors and inferred from them that Pettibone indeed was a participant in the conspiracy. But beyond Whiteagle's own statements about Pettibone, there were several communications to which Pettibone was a party, and actions that Pettibone himself took, from which the jury could reasonably infer that he was a knowing participant in the conspiracy.

First, Pettibone was copied on the March 10, 2008 email that Whiteagle sent to MCA's CEO, Wolfington, reminding him that "[w]e have devoted many months to prepare your way into the HCN <u>without pay</u> and be assured the next 5 days will determine what we do next with you with the HCN." Gov. Ex. 4-20 at 1 (emphasis in original). Whiteagle added that "Mr. C

---

[7] Although Pettibone did plead guilty to one of the bribery charges, he did not testify against Whiteagle at trial.

and I have discussed this thoroughly too that [i]f what you say changes and it[']s a continued pattern we will need to review our relationship." *Id.* The jury could readily infer from this email, a copy of which was sent to Pettibone at his Park Institute email address, that Pettibone was aware that Whiteagle was soliciting financial remuneration for both himself and Pettibone and that Pettibone's favorable treatment of MCA in the Ho-Chunk legislature was contingent upon the expectation of a financial reward. Four months after this email, Pettibone seconded the motion approving payment to MCA of more than $4 million.

Likewise, in 2008, as Atherton was pursuing the possibility of a second contract between Trinity and the Ho-Chunk Nation, she sent an email to Pettibone assuring him, "Clarence, if personal compensation was/is a concern for you, let me put your mind at ease … We cannot compensate you outright, as in a direct payment, however, Trinity can pay me, then I can compensate you [but] [w]e must be careful to protect your position as paying you directly is a criminal offense. …" Gov. Ex. 10-1. That email leaves little to the imagination; and, needless to say, the jury could reasonably have deduced that Atherton would not be so openly discussing the prospect of compensation with Pettibone were he not a knowing and active participant in the conspiracy.

Second, the testimony of Fortney, who was married to Pettibone during the time period of the charged conspiracy, supplied evidence both that Pettibone was coordinating his legislative efforts with Whiteagle, and that he was aware of an intent to reward him financially for those efforts. Fortney

testified that she overheard more than 20 conversations between Whiteagle and Pettibone regarding Cash Systems.

> They would always talk about it more when it was, like, on the legislative agenda and/or if the company was going to be talked about being replaced by the legislators by a different company, then Tim would be talking to Clarence, … we need to do this and this, we need to talk to these people, we need to get these things done to keep them in there, and things like that.

R. 185 at 125. When asked to describe Pettibone's role in these conversations, Fortney indicated that her former husband "would say, yeah, we need to talk to this person or, you know, he would kind of agree what needed to be done." R. 185 at 126. Fortney also recalled that when the subject of the conversation was the possibility that the Ho-Chunk legislature might replace Cash Systems as its vendor, Whiteagle became "worked up about it" and would "talk to Clarence a lot and say, 'We need to get these things done,' you know … ." R. 185 at 129. Whiteagle's own emails to Pettibone, suggesting various strategies that Pettibone should pursue on behalf of Cash Systems, reinforce the notion that the two men were coordinating their efforts.

Fortney also recounted Atherton's statement to her, during the time period that Atherton and Whiteagle were working with Pettibone to secure a contract for Trinity Financial, that she and Whiteagle wanted to pay Pettibone $100,000 "if everything goes through with the legislature getting Trinity in." R. 185 at 134–35. When Fortney repeated Atherton's

remark to Pettibone (against Atherton's expressed wish), Pettibone neither questioned what Atherton meant, expressed surprise, or denied the obvious implication that Atherton meant to reward him for his efforts on behalf of Trinity. Instead, he said nothing. "He didn't say anything. He didn't have any comment. He didn't have any response at all." R. 185 at 135.

Third, when Whiteagle introduced Pettibone to Trinity's representatives in April 2006, Pettibone, remarkably, asked Whiteagle "Are these the ones you want me to pick?" R. 188 at 28. And Whiteagle, of course, told him they were. It was Pettibone himself, when he subsequently met Trinity's CEO, who suggested that Trinity get its foot in the door with the Nation with a more modest proposal to perform a $250,000 preliminary housing assessment.

Fourth, although Whiteagle's heavy use of cash makes it impossible to know when and how much Pettibone was paid for his corrupt assistance to Whiteagle's clients, there are several pieces of evidence that support an inference that he was, in fact, paid. There is, of course, Payne's testimony that Whiteagle once asked him to deliver a paper bag full of cash to Pettibone. When Payne protested that this constituted bribery, Whiteagle told him, "You need to do this. This is how deals are done up here." R. 188 at 58; *see also id.* at 60. There is also the testimony and evidence surrounding the gift of the Pontiac Firebird to Pettibone, which Payne, Trinity's CEO, and Pettibone's wife, Fortney, all objected to on the ground that it amounted to a bribe. Although the transfer of the automobile was effectuated through Whiteagle's daughter, and the defense contended that the automobile was conveyed to Pettibone in

order to be raffled off for the benefit of his tae kwon do school, the jury could reasonably have concluded that the car was given to Pettibone by Whiteagle as a reward for his assistance with Trinity. Finally, apart from the checks that Cash Systems and Whiteagle both issued to the charitable foundation that funded Pettibone's tae kwon do school, Whiteagle in a number of instances used the funds he solicited from Cash Systems to purchase cashier's checks and money orders payable to Pettibone. Those payments could also be understood as both furthering and confirming the existence of a corrupt relationship between Pettibone and Whiteagle (and Whiteagle's clients).

Fifth and finally, when Pettibone was first questioned by the FBI in August 2008, he denied any knowledge of what Whiteagle did professionally, whether he had any business relationship with Cash Systems, whether Whiteagle had been compensated by Cash Systems, and whether Whiteagle and/or Atherton had a relationship with Trinity. Pettibone's professions of ignorance on these subjects were obviously false. (For example, Pettibone's wife testified that he had told her years earlier what Whiteagle did for a living.) And, as such, these lies suggest that Pettibone had culpable knowledge of the conspiracy and was attempting to distance himself from it. *See United States v. Rose*, 12 F.3d 1414, 1421 (7th Cir. 1994); *United States v. Rajewski*, 526 F.2d 149, 158 (7th Cir. 1975).

2. Causing Cash Systems to agree to bribe Pettibone

Counts 2, 3, and 5 of the superseding indictment charged Pettibone with corruptly causing an executive of Cash Systems (whom the evidence revealed to be Glaser) to agree to give a

bribe to Pettibone, an official of an Indian tribal government, with the intent to influence and reward Pettibone in connection with the business and transactions of the Ho-Chunk Nation involving a value of $5,000 or more, in violation of 18 U.S.C. §§ 666(a)(2) and 2. Section 666(a)(2) made it a crime for Glaser to agree to bribe Pettibone; section 2(b) made it a crime for Whiteagle to wilfully cause Glaser to enter into that agreement. Our review of the evidence reveals the ample proof that Whiteagle solicited bribes from Glaser for the purpose of influencing and rewarding Pettibone's efforts to help Cash Systems win and maintain its contract with the Nation. Whiteagle nonetheless argues that the evidence is insufficient to support his conviction on these counts because the government proved neither that Whiteagle intended for Pettibone to know about the bribes Whiteagle was soliciting in Pettibone's name nor that the bribes ever made their way into Pettibone's pocket.

We have already disposed of the first of these arguments in reviewing the evidence establishing that Pettibone both knew of and participated in the conspiracy charged in Count 1. That evidence amply supports the inference that Pettibone had agreed to accept, and was accepting, bribes in return for exercising his influence within the Ho-Chunk legislature for the benefit of Whiteagle's clients.

Whiteagle's second argument, regarding the lack of evidence that he ever conveyed the specific bribes referenced in these counts to Pettibone, is misplaced to the extent it was meant to raise an issue distinct from Pettibone's knowledge of the bribes. It was not necessary for the government to prove as to these counts that Pettibone actually received the bribes. *Cf.*

*United States v. Agostino*, 132 F.3d 1183, 1190 (7th Cir. 1997) (noting that section 666(a)(2) focuses on the offer of a bribe, whereas section 666(a)(1)(b) criminalizes the receipt of the bribe). Because it is phrased in the disjunctive, section 666(a)(2) separately proscribes giving, offering, *or* agreeing to give a thing of value to someone with the corrupt intent to influence a transaction covered by the statute. *United States v. Pacchioli*, 718 F.3d 1294, 1300–01 (11th Cir.), *cert. denied*, 134 S. Ct. 804 (2013). Thus, as relevant here, what section 666(a)(2) proscribes is agreeing to give a bribe to a tribal official with the intent to influence or reward him in connection with tribal business. And there is ample evidence that Whiteagle wilfully caused Glaser to do precisely that.

Count 2 charged that in late December 2006 and early January 2007, Whiteagle caused a Cash Systems executive to agree to give payments of $17,500 and $14,000 to Pettibone with the intent to influence and reward Pettibone in connection with Cash Systems' contract to provide cash access services to the Nation. Whiteagle's December 26, 2006 email to Glaser requested these same amounts from Glaser—the former to help Pettibone cover his mother's medical expenses and the latter for Pettibone's upcoming campaign—in exchange for Pettibone's help in securing a two-year contract for Cash Systems. Bank records confirm that Cash Systems wired these amounts to Whiteagle on January 8 and 11, 2007; and Whiteagle withdrew $1,500 in cash from his account immediately after the first of these wire transfers.

Count 3 alleged that in late February and early March 2007, Whiteagle caused Cash Systems to agree to pay a bribe of $8,500 to Pettibone in connection with the Cash Systems

contract. Whiteagle sent an email to Glaser on February 21, 2007, advising Glaser that "the things C [Pettibone] is doing cost little money compare[d] to what he is capable of doing for us. C needs another $8,500 for his campaign . . . . If C is out, CS [Cash Systems] is out." Gov. Ex. 3-1(i). In follow-up emails sent to Glaser on March 7 and March 12, Whiteagle reported that Pettibone favored a three-year contract for Cash Systems and asked about the status of the requested campaign funds for purposes of a meeting that Whiteagle would be having with Pettibone. On March 13, Cash Systems wired the $8,500 to Whiteagle, and two days after that, Whiteagle withdrew $3,500 from his account in cash. On March 19, Atherton ordered promotional materials for Pettibone's campaign. Whiteagle admitted in his testimony that these materials were paid for using the funds that he had solicited from Cash Systems. R. 182 at 128.

Count 5 of the superseding indictment charged Whiteagle with having caused Cash Systems in June and July of 2007 to transmit to him for the purpose of bribing Pettibone another payment in the amount of $8,000. It was Whiteagle's email of June 28, 2007, which solicited that bribe, again for the purpose of helping to defray Pettibone's campaign expenses. In that email, Whiteagle assured Glaser "t]here is no doubt now that CS will be in for another 3 to 6 months. . . . C implied that your present contract albeit if is only for a 30 day or month to month agreement is a SOLID contract" Gov. Ex. 4-10. Whiteagle went on to stress the importance of Pettibone's re-election. "I think you know while I may have a lot of voters behind C IF we don't have C we don't have a man inside to protect and promote our interests . . . . Plus if we help C then that's all the

more C would help CS. C doesn't forget a favor … ever!!!!" *Id.* Several days later, on July 2, Cash Systems wired $8,000 to Whiteagle, and over the next several weeks, Whiteagle withdrew $3,100 of that payment in cash.

Thus, in all three instances, the evidence established that Whiteagle expressly sought money from Cash Systems on Pettibone's behalf; and the evidence regarding the solicitations charged in Counts 3 and 5 exemplified Whiteagle's ongoing promises and warnings that Pettibone's presence in the Ho-Chunk legislature was essential to Cash Systems' contractual relationship with the Nation. Cash Systems' compliance with these solicitations by wiring the requested amounts to Whiteagle demonstrates its agreement to pay the solicited bribes with the intended purposes of influencing and rewarding Pettibone's actions as a tribal legislator in connection with the Cash Systems contract. As the district court put it in denying Whiteagle's post-trial motion for a judgment of acquittal, "Combined with other evidence of Whiteagle claiming to exert influence over Pettibone, the jury could reasonably have found [that] Whiteagle caused Gla[s]er to do exactly what appears: funnel bribes to Pettibone through Whiteagle." R. 208 at 10.

### 3. Aiding and abetting Pettibone's solicitation of a bribe from MCA

Count 6 charged Whiteagle with aiding and abetting Pettibone's corrupt solicitation of a bribe from a company—which the evidence revealed to be MCA—on or about March 10, 2008, in violation of sections 666(a)(1)(B) and 2(a). This charge was based on the email that Whiteagle sent to

MCA's Wolfington on that date soliciting a bribe. Whiteagle contends that the evidence did not support a finding that Pettibone had any awareness of Whiteagle's dealings with MCA and thus that this was a bribe that *Pettibone* was soliciting (which solicitation Whiteagle was aiding and abetting).

Whiteagle's March 10 email establishes otherwise, however. As we have noted, Whiteagle openly copied Pettibone on the email, in which Whiteagle made rather direct statements to Wolfington about the expectations for financial reward that both Whiteagle and Pettibone had:

> Altho its been a while for you to get in the door with the HCN [Ho-Chunk Nation] we have kept our word, you are in!! We have devoted many months to prepare your way into the HCN <u>without pay</u> and be assured the next 5 days will determine what we do next with the HCN. Mr. C and I have discussed this thoroughly too that [i]f what you say changes and it[']s a continued pattern we will need to review our relationship. …

Gov. Ex. 4-20 at 1 (emphasis in original). The jury could have inferred that although Whiteagle was the author of this email, he was speaking for Pettibone as well as himself, and that Whiteagle was, in essence, presenting Pettibone's demand for money as a condition for continuing to pave the way for MCA within the Ho-Chunk legislature. Copying Pettibone on the email could be understood as both notice to Pettibone of what Whiteagle was doing on his behalf (an inference Whiteagle essentially acknowledged as accurate in his testimony) and as confirmation to Wolfington that Whiteagle was serving as

Pettibone's agent. The jury reasonably could have concluded that Pettibone, by virtue of being copied on this email, was a party to Whiteagle's demand for money.

4. Corrupt solicitation of a job for Pettibone's cousin

Counts 7 and 8 differed from the other section 666 bribery charges in that they were based not on solicitations of cash but on the requested employment of Jon Pettibone, Clarence Pettibone's cousin. In Count 7, Whiteagle was charged with aiding and abetting Pettibone to "corruptly solicit[ ] and demand[ ] for the benefit of a relative that [MCA] employ the relative at a salary of $50,000 per year, intending to be influenced and rewarded," in violation of sections 666(a)(1)(B) and 2(a). R. 94-1 at 18. In Count 8, Whiteagle was charged with "corruptly caus[ing] an officer of [MCA] to agree to employ … a relative of Clarence P. Pettibone, an elected legislator …, with intent to influence or reward Pettibone," in violation of sections 666(a)(2) and 2(b). R. 94-1 at 19. Whiteagle challenges his conviction on these counts on the ground that neither he nor Pettibone acted "corruptly," with the intent to influence or reward Pettibone, in soliciting his cousin's employment. *See Agostino*, *supra*, 132 F.3d at 1192–93.

The argument is premised on the notion that because Whiteagle and Pettibone articulated a legitimate business rationale for MCA to hire Jon Pettibone, there is insufficient proof that they acted with the corrupt intent that the statute requires. It was Whiteagle's March 18, 2008 email that conveyed to Wolfington Pettibone's request that MCA hire both his cousin and another individual, both of whom were then employees of Cash Systems. Whiteagle stated:

> I talked to Mr. C … Mr. C. also wanted [Jon] Petti-
> bone would [sic] continue to work for the new
> [check-cashing] booths along with Roxanne Choka.
> The wage for [Jon] Pettibone would be $50,000 per
> year with Roxanne Choka getting $40,000 per year.
> They are verrrry valuable to you as they can do
> things politically that I could not do an[d] they
> would be very loyal. [Cash Systems] will fire them
> soon.

Gov. Ex. 4-39. In Whiteagle's view, this email and the balance of the evidence that the government presented as to Counts 7 and 8 "showed that Whiteagle merely suggested that MCA hire Jon Pettibone because doing so was a good business decision." Whiteagle Br. 32.

Certainly the March 18 email identified a value that employing Jon Pettibone would have for MCA beyond keeping the company in the good graces of Clarence Pettibone and, in turn, the Ho-Chunk legislature, and more than one witness testified that Jon Pettibone was a good employee; but the jury nonetheless reasonably could have construed the employment request as yet another bribe solicitation. The email on its face sought employment of Pettibone's relative at a specified, substantial salary. And coming as it did amongst other emails from Whiteagle to Wolfington making express financial demands on MCA as a condition of Pettibone's assistance in securing a contract with the Ho-Chunk nation, it would be natural to read the email as a demand for a bribe and not merely a suggestion for MCA's chief executive to consider in the exercise of his independent business judgment. Whiteagle's subsequent emails—on June 20, advising Wolfington that

"[Clarence Pettibone] wanted to know ASAP when [Jon] P or JP will be hired," Gov. Ex. 4-32, and on June 22, asking Wolfington to telephone Whiteagle "so I can relay the message to [Clarence Pettibone] . . . . . what your decision is on [Jon] Pettibone," Gov. Ex. 4-33—reinforce the inference that this was not merely a suggestion that MCA was free to accept or reject without consequence as to its prospects for doing business with the Nation. MCA, of course, complied and hired Jon Pettibone at the salary Whiteagle had specified. And from the additional testimony of MCA's Lauren Anderson—that she did not understand the purpose of hiring Jon Pettibone, given that his position duplicated that of an existing MCA employee—the jury reasonably could have inferred that MCA did so to influence or reward Clarence Pettibone for his assistance with the contract rather than for independent and legitimate business reasons. The evidence thus supports the notion that both Whiteagle and Clarence Pettibone shared a corrupt purpose in seeking the job for Jon Pettibone; the jury thus could rationally convict Whiteagle of both aiding and abetting Clarence Pettibone in soliciting the employment from MCA and of causing MCA to agree to employ Jon Pettibone.

B.  Admission of False Invoices

Whiteagle contends that the district court erred in denying his motion for a new trial based on what he contends was the erroneous admission of two pieces of evidence: (1) the obviously false invoices that Whiteagle submitted to Cash Systems nominally seeking reimbursement for expenses he had incurred in lobbying on Cash Systems' behalf, and (2) the false statements that Pettibone made denying any knowledge about Whiteagle's occupation and connection to Cash Systems when

Pettibone was first interviewed by the FBI. Whiteagle argues that the admission of the invoices unduly prejudiced him both because they constituted improper propensity evidence and because they invited the jury to speculate, without evidence connecting the invoices to the scheme, that Whiteagle used the money obtained by way of the invoices to bribe Pettibone. As to Pettibone's false statements to the FBI, Whiteagle contends that these statements similarly invited the jury to speculate that Pettibone in fact was a member of the conspiracy without actual evidence establishing that this was true.

We review the district court's denial of Whiteagle's request for a new trial for abuse of discretion. *E.g.*, *United States v. Smith*, 674 F.3d 722, 728 (7th Cir. 2012). This is a deferential standard of review; and where the defendant is complaining that the district court committed an evidentiary error, he must establish not only that the court's decision was unreasonable but that the error in admitting or excluding the evidence in question affected his substantial rights. *United States v. Causey*, 748 F.3d 310, 316 (7th Cir. 2014); *United States v. Simon*, 727 F.3d 682, 696 (7th Cir. 2013). Whiteagle has not shown that the court abused its discretion in admitting the false invoices.

The invoices were properly admitted as evidence of the charged conspiracy and substantive acts of bribery. As our summary of the trial evidence reveals, Whiteagle on a number of occasions sought and obtained specific sums of money from Cash Systems—apart from the regular salary that Cash Systems paid him—to reward and influence Pettibone for his efforts in the Ho-Chunk legislature in connection with the contract between the Nation and Cash Systems. At Glaser's request, Whiteagle began to submit invoices to Cash Systems

seeking reimbursement for various expenses that he had purportedly incurred as the company's lobbyist. The expenses claimed in the invoices were obviously a fabrication, and this was almost immediately apparent to Cash Systems personnel like Brian Johnson. It is a natural and obvious inference that Whiteagle prepared and submitted the invoice to supply cover for the bribes he was soliciting on Pettibone's behalf. The invoices were thus proof not simply that Whiteagle was lying about his expenses, but that he was doing so for the purpose of attempting to conceal and facilitate the illegal efforts that he and Pettibone were making to obtain bribes from Cash Systems. And the context in which these invoices were submitted to Cash Systems belies Whiteagle's contention that there was no evidence connecting these invoices to the charged conspiracy and bribery offenses: Whiteagle's own emails setting forth the demands for money to influence and reward Pettibone, and Cash Systems' compliance with these demands by wiring to Whiteagle the specific sums he sought, shed all the illumination that was necessary to support an inference that Whiteagle prepared and submitted the false invoices to Cash Systems in furtherance of the charged offenses. The defense was obviously free to put a different spin on the invoices, as it did: it argued that the invoices were consistent with Whiteagle making false claims about influencing Pettibone and pocketing the cash rather than using it to bribe the legislator (a defense that rings hollow in light of the evidence we have discussed previously). In any case, Whiteagle is wrong that the invoices amounted to mere propensity evidence and that only speculation could connect them to the offenses with which he was charged. The district court did not abuse its

discretion either in admitting the invoices or in denying Whiteagle's request for a new trial to the extent it was based on the admission of the invoices.

Nor was Whiteagle entitled to a new trial based on the admission of the false statements that Pettibone made about Whiteagle when first interviewed by the FBI. The statements were not admitted for their truth; in light of the other evidence presented in the case, the statements were quite obviously false. Consequently, they did not constitute hearsay, as Whiteagle contends. *See Anderson v. United States*, 417 U.S. 211, 219–20, 94 S. Ct. 2253, 2260 (1974); *United States v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994); *United States v. Adkins*, 741 F.2d 744, 746 (5th Cir. 1984).[8] And the fact that Pettibone falsely

---

[8] Our holding on this point is not contrary to the majority opinion in *Lyle v. Koehler*, 720 F.2d 426, 431–35 (6th Cir. 1983), on which Whiteagle relies. The letters at issue in *Lyle* solicited the recipients' cooperation in creating a false alibi for the defendant and his co-defendant (the author of the letters). The *Lyle* court accepted that the statements regarding the alibi were not admitted for their truth, as the alibi was obviously false. *See id.* at 432. The court was instead concerned that the letters' pursuit of a false alibi, coupled with their identification of the defendant, amounted to out-of-court statements implicating the defendant in the charged offense; and because the author of the letters was the co-defendant, the defendant was unable to cross-examine him. "[The letters] were introduced because by inference they assert the proposition of fact that Kemp and Lyle committed the robbery and hence need[ed] an alibi. Accordingly, we conclude that the letters are hearsay and that their use implicated Lyle's right to confront and cross-examine the witnesses against him." *Id.* at 433 (footnote omitted). Here, Pettibone's false statements, although they supported an inference of his own participation in the conspiracy, did not expressly inculpate Whiteagle in the inflammatory way that the letters at issue in *Lyle* incrimi-

(continued...)

claimed ignorance of things that he in fact knew about Whiteagle tended to show that he was, contrary to Whiteagle's defense, a knowledgeable and culpable participant in the bribery conspiracy and was attempting to cover up his involvement. *See United States v. Rosen*, 716 F.3d 691, 702 (2d Cir. 2013). Pettibone's statements were properly admitted, and did not unduly prejudice Whiteagle.

C.  Sentencing

Whiteagle raises two objections to the district court's Guidelines calculations. First, he contends that the court erred in applying the bribery guideline, § 2C1.1, rather than the gratuity guideline, § 2C1.2 , in calculating his offense level. He also argues that the court assigned an excessive monetary value to his bribery offenses. These errors, he contends, resulted in an inappropriately high Guidelines range such that the sentence imposed, although well below that range, must be vacated and reconsidered.

We may quickly dispose of the first of these objections: the district court properly employed the bribery guideline in determining Whiteagle's offense level. What distinguishes a bribe from a gratuity is a purpose to corruptly influence the recipient's actions as a public official. *See United States v. Anderson*, 517 F.3d 953, 961 (7th Cir. 2008); § 2C1.1, comment. (backg'd). Consistent with that distinction, we have observed, "If the payer's intent is to influence or affect future actions,

---

[8] (...continued)

nated the defendant there; and they were, of course, his own statements rather than those of a co-defendant whom he could not cross-examine.

then the payment is a bribe. If, on the other hand, the payer intends the money as a reward for actions the payee has already taken, or is already committed to take, then the payment is a gratuity." *Anderson*, 517 F.3d at 961 (quoting *Agostino*, *supra*, 132 F.3d at 1195). Whiteagle reasons that because many, if not most of the payments that the government characterizes as bribes were tendered after the pertinent legislative action had already occurred, the payments necessarily constituted gratuities. *See United States v. Arroyo*, 581 F.2d 649, 658 (7th Cir.1978) (Swygert, J., dissenting). But whether to characterize the payments as gratuities or bribes presented a fact question for the court to resolve, *see Anderson*, 517 F.3d at 961–62, and the court did not clearly err in finding that the payments were bribes. The timing of the payments by no means precludes the inference that the payments were both solicited and tendered for a corrupt purpose— in other words, that Pettibone, in anticipation of these payments, would agree to take actions favorable to companies tendering them. The payments were part of an ongoing course of conduct, and there was ample evidence in this case supporting the inference that Whiteagle solicited money and other things of value on Pettibone's behalf with the express understanding that Pettibone would take future actions favorable to the companies from which the payments were sought. The district court itself found that Whiteagle solicited money and other things of value from his clients, and funneled the same to Pettibone and his family members, in order to corruptly influence Pettibone's actions as an elected member of the Ho-Chunk legislature. R. 223 at 3. The court therefore applied the correct guideline.

Whiteagle's second contention is that the district court assigned an incorrect dollar value to the bribery in this case. The bribery guideline specifies the following with respect to the loss or other value associated with the bribes:

> If the value of the payment, the benefit received or to be received in return for the payment, the value of anything obtained or to be obtained by a public official or others acting with a public official, or the loss to the government, whichever is greatest, exceeds $5,000, increase [the offense level] by the number of levels from the table in § 2B1.1 (Theft, Property Destruction, and Fraud) corresponding to that amount.

§ 2C1.1(b)(2). Pursuant to this provision, the district court increased Whiteagle's base offense level by 18 levels, finding that the relevant value was between $2.5 million and $7 million. *See* § 2B1.1(b)(1)(J). The court reasoned that either of two different measures of the bribery justified this conclusion. First, Whiteagle's clients received contracts worth at least $7 million that they theoretically might have received without Whiteagle's corrupt assistance but which, in the court's view, likely would have gone to others. *See* R. 223 at 3. Second, Whiteagle received payments from those clients exceeding $2.5 million, and overwhelming evidence indicated that he would not have received those payments absent his ability to deliver Pettibone's support, which was facilitated through bribery. *Id.*

Whiteagle contends that either measure was an incorrect reference point for the court to use. He views the total value of the contracts with Cash Systems, MCA, and Trinity Financial

as excessive for two reasons: (1) given that all but one of the relevant votes in the Ho-Chunk legislature were unanimous, there is no evidence that Pettibone's corrupt influence was the but-for cause of the decisions to award the contracts to these companies; and (2) given that the Nation did receive significant value from the services provided by those companies, the monetary value of Whiteagle's offenses necessarily must be a figure well below the total contract amounts, even if the selection process was corrupted by the bribery of Pettibone. Whiteagle also sees the total of the payments he received from those companies as an inappropriate measure, because the companies willingly paid those sums to him as a consultant as a cost of doing business with the Nation.

Whiteagle suggests that the true value that the court should have used was the sum of the bribes that the evidence shows were transmitted to Pettibone. These include the Firebird automobile, which had an estimated value of $8,000; the $16,000 in payments that Whiteagle made directly to Pettibone's tae kwon do school; the $13,500 in payments that Cash Systems paid directly to Pettibone's school; and the $45,000 cashier's check that Whiteagle purchased in the name of the not-for-profit organization (Park Institute) that funded the tae kwon do school[9]—for a total of $82,500.[10] That total would call

---

[9]   As discussed above, Whiteagle later redirected that check into his own account; but for this purpose Whiteagle apparently concedes that the check was originally meant for Pettibone.

[10]   Defendant's brief cites the total as $92,500, but the individual amounts he includes in his loss calculation add up to only $82,500. *See* Whiteagle Br.

(continued...)

for an eight-level increase in the base level rather than an 18-level increase. Of course, Whiteagle is excluding from his calculation the additional monies that he sought and received on Pettibone's behalf, but as to which there is no paper trail to confirm that money made its way into Pettibone's pocket. These sums would have boosted the relevant total beyond $82,500. Nonetheless, we take his point: if the relevant figure is limited to the bribes themselves, the increase called for by section 2C1.1(b)(2) would have been significantly less than the 18-level increase the district court applied.

We can sustain the district court's assessment based on the second of the two alternative measures it relied on: the total amount of money paid to Whiteagle by the companies seeking to do business with the Nation. It was reasonable to infer, as the district court did, that the three companies were willing to pay Whiteagle such large sums of money specifically because of his relationship with Pettibone and his professed ability to deliver Pettibone's vote and influence within the Ho-Chunk legislature. For example, Roscoe Holmes, a former Cash Systems employee, himself thought that the monthly salary being paid to Whiteagle was excessive compensation for a lobbyist and advisor on tribal affairs (which is what Holmes understood Whiteagle's role to be); and the amounts paid to Whiteagle were eye-popping relative to Cash Systems' revenue. Moreover, Whiteagle's insistence that his role be kept quiet (recall MCA's laundering of his compensation through Support Consultants, and Whiteagle's suggestions that Trinity

---

[10] (...continued)
39; Reply Br. 16.

hide the proposed consulting fees meant for Atherton and himself in other expenses) supported an inference that his compensation was not legitimately earned. It is also a fair inference, given the evidence presented at trial, that it was the bribes Whiteagle transmitted to Pettibone, rather than Whiteagle's persuasiveness as a lobbyist, that secured Pettibone's favorable action as a legislator: Whiteagle's own communications with the vendors give rise to that inference. In short, it was perfectly reasonable for the court to conclude that Whiteagle would not have been able to command his ample, even exorbitant compensation from the companies absent his corrupt relationship with Pettibone. That renders the total compensation he received a reasonable monetary measure of the value of the bribery in this case. And as there is no dispute that Whiteagle was paid in excess of $2.5 million by the three companies, the court did not err in increasing Whiteagle's offense level by 18 levels.

### III.

For the foregoing reasons, we AFFIRM the convictions and sentence.